1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   DUARTE NURSERY, INC., a California          No.  2:13-cv-02095-KJM-AC
     Corporation; and JOHN DUARTE, an
12   individual,

13                  Plaintiffs,                  ORDER

14          v.

15   UNITED STATES ARMY CORPS OF
     ENGINEERS,
16
                    Defendant.
17

18   AND RELATED COUNTERCLAIMS

19

20          This matter is before the court on cross-motions for summary judgment brought by

21   plaintiff Duarte Nursery, Inc. (the Nursery), plaintiff John Duarte, and defendant United States

22   Army Corps of Engineers (the Army Corps) and counterclaim-plaintiff United States of America

23   (collectively, "the United States").  ECF Nos. 128, 136, 138, 139.  The United States also moves

24   to dismiss or in the alternative for summary judgment on plaintiffs' retaliatory prosecution claim.

25   ECF No. 134.  The court received oppositions and replies, ECF Nos.  152–161, and held a

26   hearing on November 20, 2015 on the cross-motions.  Anthony Francois, David Ivester, Gerald

27   Brunn, and Peter Prows appeared for the Nursery and Duarte.  Andrew Doyle, Gregory

28   Broderick, and Samara Spence appeared for the United States.

                                            1

1    For reasons explained below, the court GRANTS the United States' motions for

2  summary judgment on plaintiffs' Due Process claims and the United States' Clean Water Act

3  (CWA) counterclaim.  The court GRANTS the United States' motion to dismiss plaintiffs'

4  retaliatory prosecution claim WITHOUT LEAVE TO AMEND.

5  I.    PROCEDURAL HISTORY

6    The operative Second Amended Complaint (SAC) alleges that the Army Corps

7  violated plaintiffs' Fifth Amendment right to due process and First Amendment right against

8  retaliatory prosecution.  *See generally* ECF No. 90.  The United States' Counterclaim against

9  plaintiffs alleges violation of § 301(a) of the CWA, 33 U.S.C. § 1311(a).[1]  ECF No. 28 at 16.

10  After two rounds of motions to dismiss, the parties have filed the pending cross-motions for

11  summary judgment and motion to dismiss.  ECF Nos. 127, 134, 136, 138, 139.

12  II.    EVIDENTIARY OBJECTIONS

13    Rule 56 allows objections to evidence when "the material cited . . . cannot be

14  presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).  As this

15  language suggests, at summary judgment, the evidence's propriety depends not on its form, but

16  on its content.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Block v. City of L.A.*, 253 F.3d

17  410, 418–19 (9th Cir. 2001).  The party seeking admission of evidence "bears the burden of proof

18  of admissibility."  *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  Upon

19  objection, that party must direct the district court to "authenticating documents, deposition

20  testimony bearing on attribution, hearsay exceptions and exemptions, or other evidentiary

21  principles under which the evidence in question could be deemed admissible . . . ."  *In re Oracle*

22  *Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  But courts are sometimes "much more

23  lenient" with the affidavits and documents of the party opposing summary judgment.  *Scharf v.*

24  *U.S. Atty. Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979).

25

26    [1] The parties previously stipulated with the court's approval that the United States need
not reassert its Counterclaim, ECF No. 28, should Duarte file an amended complaint.  ECF No.
27  64.  The United States thus did not file an amended Counterclaim upon plaintiffs' filing of the
28  Second Amended Complaint.

1       Plaintiffs' objections on relevance and hearsay grounds are addressed below.

2           A.      Relevance

3       First, "moving papers themselves—not separate tables of objections—are the

4   correct mode of objection on relevance and similar grounds."  *Gonzalez v. Cty. of Yolo*, No. 13-

5   01368 KJM AC, 2015 WL 4419025, at *4 (E.D. Cal. July 17, 2015) (citations omitted).  Federal

6   Rule of Civil Procedure 56 expressly seeks out genuine disputes of material facts.  "A court can

7   award summary judgment only when there is no genuine dispute of material fact.  It cannot rely

8   on irrelevant facts, and thus relevance objections are redundant."  *Burch v. Regents of Univ. of

9   Cal.*, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006).

10      Accordingly, the court overrules objections based on relevance.

11          B.      Hearsay

12      Second, objections to form are often a poor fit for summary judgment.  At this

13  stage, the propriety of evidence depends not on its form, but on its content.  *Celotex*, 477 U.S. at

14  324 ("We do not mean that the nonmoving party must produce evidence in a form that would be

15  admissible at trial in order to avoid summary judgment . . . .  [Rule 56] permits a proper summary

16  judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c),

17  except the mere pleadings themselves."); *see also Block*, 253 F.3d at 418–19.  Rule 56(e) uses the

18  modal construction, "would be admissible," for a reason.  In particular, hearsay objections are

19  often premature at summary judgment when asserted by the moving party.  Should the court grant

20  a motion for summary judgment, it must do so on the basis of admissible evidence.  *Gonzalez*,

21  2015 WL 4419025, at *4.  But a party opposing a motion for summary judgment seeks a trial, not

22  a verdict, and it stands to reason that if evidence may probably be converted to admissible form

23  for trial, it should not be excluded at summary judgment.  *See Fraser*, 342 F.3d at 1036 (declining

24  to exclude hearsay statements because in a different form the testimony could be admitted at

25  trial); *Hatcher v. Cty. of Alameda*, No. 09-1650, 2011 WL 1225790, at *3 (N.D. Cal. Mar. 31,

26  2011) (same).

27      To the extent objections are not premature and are proper at this time, evidence is

28  admissible if it is defined as non-hearsay under Federal Rule of Evidence 801(d) or falls within a

3

1   hearsay exception under Rules 803, 804, or 807.  Rule 803(6) provides an exception for records

2   of a regularly conducted activity.  Rule 803(8) provides an exception for public records.  And an

3   opposing party's statement offered against that party is not considered hearsay. Fed. R. Evid.

4   801(d)(2)(A).  Likewise, statements offered against a party that were made by the party's agent or

5   employee on a topic that is within the scope of the employment relationship are excluded from

6   the hearsay rule.  Fed. R. Evid. 801(d)(2).

7       The objections to hearsay are overruled to the extent the evidence objected to on

8   this ground is discussed below.

9   III.   UNDISPUTED FACTS

10      Under the CWA regulations, "waters of the United States" cover all traditionally

11  navigable waters, tributaries of these waters, and wetlands adjacent to traditionally navigable

12  waters, the last of which will be discussed below.  33 C.F.R. § 328.3(a)(1), (5) and (7).  In

13  Tehama County, California, the Sacramento River is navigable-in-fact until it reaches San

14  Francisco Bay and the Pacific Ocean.  Duarte's Resp. to the United States' CWA Separate Stmt.

15  (DRCWA) No. 1, ECF No. 150-11.  Two tributaries of the Sacramento River in Tehama County

16  are Coyote Creek and Oat Creek.  DRCWA No. 2.  In Tehama County, Coyote Creek generally

17  flows easterly and southeasterly to its junction with Oat Creek.  DRCWA No. 3.  From that

18  junction, Oat Creek meets the Sacramento River within a mile.  DRCWA No. 4.  The watersheds

19  of Coyote Creek and Oat Creek contain associated streams and wetlands.  DRCWA No. 5.  A

20  report by the United States' expert provides several aerial maps that show these waterways and

21  their relation to plaintiff's property.  The court includes several of the maps below for the purpose

22  of clarifying the locations of plaintiff's property and the "waters of the United States" at issue

23  here.  Each map is marked with a compass on the upper right hand corner, indicating the top of

24  the map is the North, the right of the map is the East, the left of the map is the West, and the

25  bottom of the map is the South.

26  /////

27  /////

28  /////

4



**Figure 34 Coyote Creek and its tributaries**

Stokely Expert Report at 55, ECF No. 124-1 (showing Coyote Creek Watershed outlined in pink, and the plaintiffs' property outlined in black; black arrows point to headwater tributaries; yellow arrows point to a tributary of Coyote Creek; red arrows point to main stem of Coyote Creek below Paskenta Road; all branches and headwater tributaries join mainstem of Coyote Creek on or just downstream of plaintiffs' property).

       John Duarte was the president of the Nursery when it purchased approximately 1,950 to 2,000 acres of real estate in Tehama County, California in April 2012, after referral of the site from a Brad Munson.  Nursery's Resp. to United States' Due Process Separate Stmt. (NRDP) No. 4, ECF No. 153-1[3]; Munson Dep. 16:13–18, ECF No. 112; John Duarte Dep.

_____

[3] The parties each submitted a separate statement of undisputed facts for each claim, and numerous facts overlap among the statements.  To avoid lengthy string citations, though certain undisputed facts may appear in multiple statements, the court cites to only one.

21:11-13, 22–24, ECF No. 109.  Coyote Creek flows along the northern border of the real estate, which was bounded on the west by Paskenta Road; the property has an unusual shape in the southwest corner, separated by a fence that is not shown on any of the maps.  DRCW No. 7–9.

Prior to the April purchase, in March 2012, the Nursery entered into a contract with Goose Pond to sell approximately 1,500 acres of the northern portion of the real estate. NRDP No. 11.  The Nursery then retained NorthStar Environmental (NorthStar), an environmental consulting firm, to provide a report and delineation map for the 1,500 acres. DRCWA No. 13; NRDP No. 19.  The Nursery also asked NorthStar to provide a separate report and delineation map for the remaining approximately 450 acres, the parcel retained by the plaintiffs and at issue here (the Property).[4]  *Id.*  The Nursery requested that NorthStar "map appropriate buffers around all wetlands."  DRCWA No. 14.  In May 2012, NorthStar sent a letter to Jim Duarte, father of plaintiff John Duarte, suggesting the Nursery should have NorthStar's draft delineations verified by the Army Corps prior to any grading activities.  ECF No. 131-3, NSE0005677.  At the time Jim Duarte was the chairman of the Nursery's board; John Duarte was the president of the Nursery, and had been the president since sometime between 2008 and 2010. John Duarte Dep. 21:22–22:5.  As president, John Duarte was responsible for the general management of the Nursery, including decisions with respect to land purchase and land usage. *Id.* 22:9–14.  In 2012, John Duarte had significant input over activities and precautions taken with respect to the real estate.  *Id.* 23:7–15.

Prior to purchasing the approximately 2,000 acres, plaintiffs were aware of a February 2012 draft delineation provided by NorthStar for the entire acreage.  NRDP No. 2; ECF No. 131-1 at 1.  The February 2012 draft delineation noted there were a total of 40.78 acres of pre-jurisdictional waters of the United States on the real estate as a whole.  ECF No. 131-1 at 10.

In July 2012, NorthStar produced a "Draft Delineation of Waters of the United States" for the Property, the 450 acres not covered by the Goose Pond contract.  NRDP No. 14. This NorthStar report stated:

1
2
3

Areas of intact vernal and seasonal swales occur within the Property along with a number of intermittent and ephemeral drainages.  Little evidence of past agricultural activities was observed on the Property.  The Property has, however, been used in the past as open grazing land . . . .

4

. . .

5
6
7
8
9

A total of 16.17 of pre-jurisdictional waters of the U.S. were delineated within the Property.  The types of waters of the U.S. identified on-site are distinguished as vernal pools, vernal swales, seasonal wetlands, seasonal swales and other waters including intermittent and ephemeral drainages.  These features are mapped at a 1" to 200' scale and are presented in Attachment A.  Waters of the U.S. acreages presented in this report should be considered preliminary, subject to review and modification by the [Army Corps] during the wetland delineation verification process.

10    NorthStar July 2012 Draft Delineation (NorthStar 2012 Draft), ECF No. 131-4 at 1, 9.  The

11    NorthStar 2012 Draft also provided a brief summary of the jurisdictional features of U.S. waters:

12    **Vernal Pools and Swales**

13
14
15
16
17
18
19
20
21
22
23
24
25

Vernal pools are defined by the positive indication of three wetland parameters: hydrophytic vegetation specific to vernal pools, hydric soils, and hydrology (*i.e.*, ponding).  All three parameters must be present to satisfy the vernal pool definition . . . .  In addition . . . vernal pools exhibit unique characteristics.  Vernal pools form where there is a soil layer below or at the surface that is impermeable or nearly impermeable.  Precipitation and surface runoff become trapped or "perched" above this layer.  Hardpans are formed by leaching, re-deposition, and cementing of silica materials from high in the soil horizon to a lower horizon.  In addition, vernal pools typically occur in landscapes that . . . are shallowly sloping or nearly level, but on a finer scale may be quite bumpy or uneven . . . vernal pools in the Central Valley tend to occur in clusters called "complexes."  Within these complexes, pools may be fed or connected by low drainage pathways called "swales," which were detected throughout the site.  Swales are often themselves seasonal wetlands that remain inundated with water for much of the wet season, but not long enough to support strong vernal pool characteristics.  Vernal pools may remain inundated until spring or early summer, sometimes filling and emptying numerous times during the wet season.  Vernal pools gradually dry down during the spring . . . .  The project area supports 1.07 acres of vernal pools and 4.02 acres of vernal swales.  Vernal pools and swales were located primarily in the southwestern portion of the Property where farming has not occurred.

26    **Seasonal Wetlands and Swales**

27
28

Similar to vernal features, seasonal wetlands and swales are defined by the positive indication of three wetland parameters: hydrophytic vegetation, hydric soils, and hydrology . . . .  Seasonal wetlands

tend to lack standing water during the late summer months, or during prolonged dry periods . . . .  The project area supports 0.82 acre of seasonal wetlands and 2.86 acres of seasonal swales.

**Other Waters of the United States**

Other waters of the U.S. are seasonal or perennial water bodies, including lakes, stream channels, drainages, ponds, and other surface water features that exhibit an ordinary high-water mark but lack positive indicators for one or more of the three wetlands parameters . . .  A total of 7.40 acres . . . of other waters of the U.S. were delineated on-site.

. . .

*Significant Nexus*

Wetlands within the [Property] hold floodwaters and intercept sheet flow from uplands, releasing water in a more consistent manner. These wetlands collect and hold water during significant rain events acting as a biological filter collecting the first flush prior to filtering into [downstream waters].

*Hydrology*

Hydrology within the Property is characterized by localized surface sheet flow and sub-surface flows from precipitation events.  The wetland features on the site all sheet flow or have subsurface flows that drain into one of the multiple other water drainages on the site. These drainages all flow directly into the [Relatively Permanent Waters (RPW)], Coyote Creek . . . .

NorthStar 2012 Draft at 9–12 (citations omitted).  The NorthStar report's "significant nexus"

analysis is similar to that of the Army Corps' expert report:

The wetlands and water on-site are hydrologically connected . . . and help to moderate flood flows due to storm events, provide filtration to sediments and pollutants prior to entering Coyote Creek and are designated critical habitat and are known to support the Federally-listed vernal pool fairy shrimp and . . . tadpole shrimp.

Army Corps Expert Report at 2.  The United States' expert report shows vernal pools and swales

on the property as of March 2010:

/////

/////

/////

/////

/////



**Figure 15 2010**

Stokely Expert Report at 36 (in March 2010 pools and swales were still visible as highlighted by yellow circles; yellow arrow points to tributary of Coyote Creek).

        In November 2012, the Nursery completed the sale of the 1,500-acre northern portion of the real estate to Goose Pond for 8.7 million dollars. NRDP No. 16. Brad Munson received compensation of $147,000 for that sale. Munson Dep. 50:6–12. At about this time the Nursery asked Munson to arrange for farming activities on the Property. ECF No. 117-4; Munson Dep. 50:13–52:12. There had been no farming activity on the Property since 1988. Stokely Expert Report at 6, ECF No. 1224-1. Munson contacted a mill, which was a wheat buyer in Artois, California, who recommended Caleb Unruh to do the farming. Munson Dep. 51:7–52:8. Munson was familiar with Unruh, because Unruh harvested the wheat in the northern portion of the Property for the previous owner of the real estate. Unruh Dep. 45:10–46:7, ECF No. 114. Munson instructed Unruh to plant, care for, and harvest wheat on the Property, except the area south of the fence line. Munson Dep. 52:13–53:3; NRDP No. 16; DRCWA No. 21;

9

1   Unruh 62:19–64:5.  Munson instructed Unruh to till the Property 12 inches or less to loosen the

2   soil for rip penetration.  Unruh Dep. 55:4–6, 13–15; *id.* 118:4–9.  Rip penetration is the process of

3   turning the garden so the soil is loosened and water, roots, and air can penetrate.  *Id.* 55:22–56:7.

4   Munson paid Unruh for the tillage with funds from the Nursery.  NRDP Nos. 21, 22.

5                    For the tillage, Unruh used a 360-horsepower International Harvester Case

6   Quadtrac 9370 with Wilcox ripper, NSC 36-24-7, as an attachment (the Equipment).  DRCWA

7   No. 23; Unruh Dep. 93:6–94:5.  The Equipment has seven 36-inch shanks, which are spaced 24

8   inches apart.  Unruh Dep. 93:17–94:5.  When used in tillage, the Equipment causes material to

9   move horizontally, and the shanks create furrows and ridges to the left and right of the furrows.

10  DRCWA No. 29.  Unruh noted when he tilled the ground was hard from "just [sitting] there" and

11  the shanks of the ripper were unable to penetrate more than four to six inches.  Unruh Dep.

12  98:9-24.  The Equipment did not avoid all of the wetlands delineated by NorthStar.  DRCWA No.

13  28.  The United States' expert report includes a diagram showing the areas tilled and those not:



**Figure 17 2013**

1    Stokely Expert Report at 38 (Property outlined in black; red lines show area plowed, and yellow

2    highlights mark indentations on ground, which show the Equipment turned around on the edge of

3    the Property; black filled-in areas were not tilled).

4              On November 28, 2012, Matthew Kelley from the Army Corps' Redding office

5    drove past the Property.  NRDP No. 24.  Kelley observed activities and equipment on the

6    Property.  He believed there were potential CWA violations and took photographs.  Retaliation

7    Stmt. of Undisputed Material Facts (RSUMF) No. 5, ECF No. 158-1.  On December 3, 2012,

8    Kelley communicated with state regulators regarding the potential violation as part of his

9    investigation.  RSUMF No. 10.  Kelley returned to the Property on December 6, 2012 and

10   observed what he believed to be ripping on the Property.  RSUMF Nos. 11, 12.

11             Kelley later learned the Nursery owned the Property, RSUMF No. 16, and on

12   December 11, 2012, Kelley called John Duarte, NRDP No. 26.  During the December 11, 2012

13   conversation, Kelley informed John Duarte that he observed ripping activities that required a

14   permit under the CWA.  NRDP No. 27.  John Duarte told Kelley "they knew where the wetlands

15   were and were staying away from them," but Kelley contended the wetlands had not been

16   avoided.  NRDP No. 28.  John Duarte later conceded he learned in the summer of 2014 that the

17   tillage did not avoid all of the wetlands delineated by NorthStar.  NRDP No. 31.  Kelley advised

18   John Duarte during the December 2012 conversation that the Army Corps would be sending a

19   formal cease and desist letter (C&D Letter) notifying the Nursery of its violations of the CWA,

20   and it should thus cease and desist any unauthorized activity in the waters of the United States.

21   RSUMF No. 20.

22             After the conversation, Kelley began working on the C&D Letter.  On

23   December 17, 2012, Kelley returned to the Property and took photos of the equipment and the

24   land.  NRDP No. 25. On February 19, 2013, Kelley completed an initial investigation memo

25   regarding the Nursery's activities on the Property.  RSUMF No. 22.  The Army Corps sent the

26   C&D Letter to the Nursery on February 25, 2013.  RSUMF No. 23.  The C&D Letter stated as

27   follows in pertinent part:

28
                                        11

This letter concerns your unauthorized work in waters of the United States. The work is located on or near Coyote Creek . . .

Based on available information we have determined that you have discharged dredged or fill material into seasonal wetlands, vernal pools, ve[r]nal swales, and intermittent and ephemeral drainages, which are waters of the United States, without a Department of the Army (DA) permit. Section 404 of the [CWA] required that a DA permit be obtained prior to the discharge of dredged or fill material into waters of the United States, including wetlands. Since a DA permit has not been issued authorizing this discharge, the work is in violation of the [CWA].

You are hereby directed to cease and desist all work in waters of the United States until this violation is resolved. We are conducting an investigation to determine the impact of this work as it relates to public interest and the appropriate course of action to remedy the situation. Potential enforcement actions, in addition to or in lieu of fines, penalties and imprisonment, include directing removal of the unauthorized work and restoration of the site . . . . Prompt voluntary restoration of the site in accordance with a Corps-approved plan may preclude some or all of these actions.

. . .

To ensure that all pertinent information is available for our evaluation and included in the public record, you are invited to provide any information which you feel should be considered. Your plans for utilization of the completed work and your evaluation of the need to retain this fill may be of particular significance in determining what actions are to be taken.

C&D Letter, ECF No. 116-3. With respect to the Nursery, it was John Duarte's decision as the Nursery's president whether to follow up with the Army Corps after Kelley's call in December 2012, and the subsequent C&D Letter. James (Jim) Duarte Dep. 154:4–7, 165:21–24, 181:6–10, ECF No. 108. Upon receiving the Army Corps' letter, the Nursery sought counsel. NRDP No. 42. The Nursery responded to the C&D Letter through counsel in a letter dated March 21, 2013. NRDP No. 43; *see also* March 2013 Response, ECF No. 116–4.

The March 2013 letter stated the following:

[The Army Corps] accused my client, without any proof or documentation, of undertaking "unauthorized work in waters of the United States." This allegation is completely without merit, and . . . I insist you immediately provide any and all documentation which you utilized in order to make this false allegation of wrongdoing. I further demand that you describe, with exact specificity, the precise location where the alleged "unauthorized work" occurred, including GPS coordinates and a complete legal description. This

12

> information is necessary in order for me to even begin to understand any aspects of [the C&D Letter].
>
> . . . .   Please provide, within 10 working days, all "available information" you and your agency used in this matter. [Footnote omitted.]   In addition, . . . also provide all agency policies, regulations, memorandums, communications, and/or guidance documents utilized to ascertain the presence or absence of seasonal wetlands, vernal pools, vernal swales, and intermittent and ephemeral drainages which are waters of the United States within 10 days.

March 2013 Response at 1.  The March 2013 letter also requested that the Army Corps clarify whether the C&D Letter was an enforcement action, and pointed out that § 404, codified at 33 U.S.C. § 1344, exempted agriculture from the § 404 permit requirement.  *Id.* at 2.

In reply, the Army Corps provided a copy of a 1994 delineation of the property on a compact disc and requested information from the Nursery in response to a series of questions.  April 2013 Letter, ECF No. 116-6; NRDP No. 45.  The Nursery and John Duarte did not provide the information requested.  NRDP No. 46.

Within the Army Corps, the matter was then transferred from Kelley to James Robb, a staff member in the Corps' enforcement division.  RSUMF No. 24.  Robb believed the Nursery's activities on the Property constituted a violation of the CWA, and decided to make a formal referral to the U.S. Environmental Protection Agency (EPA) for enforcement.  RSUMF Nos. 25, 26.  On October 9, 2013, the referral package was completed and "sent for printing," e.g., the formal package was completed and waiting to be signed off by someone with authority.  RSUMF No. 27.  Up to this point, no one at the Army Corps was aware of any lawsuit by the Nursery or John Duarte.  RSUMF No. 28.

On October 10, 2013, the Nursery filed this action against the Army Corps.  RSUMF No. 29; *see also* Compl., ECF No. 1.  The referral package had not yet been sent to the EPA when the action was filed.  RSUMF No. 30.  The Army Corps and the EPA met and conferred after they became aware of the lawsuit.  RSUMF No. 31.  The EPA indicated if it received the referral package, it would decline it, because the lawsuit was a "complicating factor."  *Id.*

1    Michael Jewell, the Army Corps' regulatory division chief and second-line

2    supervisor for the Sacramento District, stated he believed the Nursery's case was a flagrant

3    violation of the CWA, and it would be inappropriate to walk away after EPA's refusal to take the

4    referral.  RSUMF No. 32.  The Army Corps subsequently referred the matter to the Department of

5    Justice (DOJ).  RSUMF No. 33.  On March 25, 2014, the Army Corps received permission from

6    the Assistant Attorney General for the Environment and Natural Resources Division to assert an

7    enforcement action against the Nursery and John Duarte as a counterclaim in this action.  *Id.*

8    IV.    LEGAL STANDARDS

9    A.    Motion for Summary Judgment

10    A court must grant a motion for summary judgment "if the movant shows there is

11    no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

12    law."  Fed. R. Civ. P. 56(a).  A motion for summary judgment calls for a "threshold inquiry" into

13    whether a trial is necessary at all, that is, whether "any genuine factual issues . . . properly can be

14    resolved only by a finder of fact because they may reasonably be resolved in favor of either

15    party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The court does not weigh

16    evidence or assess the credibility of witnesses; rather, it determines which facts the parties do not

17    dispute, then draws all inferences and views all evidence in the light most favorable to the

18    nonmoving party.  *See id.* at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

19    574, 587–88 (1986).  "Where the record taken as a whole could not lead a rational trier of fact to

20    find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587

21    (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

22    The moving party bears the initial burden of "informing the district court of the

23    basis for its motion, and identifying those portions of [the record] which it believes demonstrate

24    the absence of a genuine issue of material fact."  *Celotex*, 477 U.S. at 323.  If the party opposing

25    summary judgment bears the burden of proof at trial, the moving party need only illustrate the

26    "absence of evidence to support the non-moving party's case."  *In re Oracle Corp. Sec. Litig.*,

27    627 F.3d 376, 387 (9th Cir. 2010).  The burden then shifts to the nonmoving party to "go beyond

28    the pleadings" and "designate specific facts showing that there is a genuine issue for trial."

14

1    *Celotex*, 477 U.S. at 324 (quotation marks omitted).  The non-moving party "must do more than

2    simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475

3    U.S. at 586.  "Only disputes over facts that might affect the outcome of the suit under the

4    governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at

5    248.

6            B.      Law of the Case

7            This case was reassigned to the undersigned on August 27, 2014.  In its motions

8    now before the court, the United States asks the court to reconsider issues the predecessor judge

9    previously decided, specifically the issues of sovereign immunity and deprivation with respect to

10   the due process claims.

11           In the Ninth Circuit, the standard to apply when one judge is asked to reconsider

12   another's order in the same case is not entirely clear. *Baldwin v. United States*, 823 F. Supp. 2d

13   1087, 1099 (D. N. Mar. I. 2011).  In *Amarel v. Connell*, the Circuit was "confronted . . . with the

14   difficult problem of district court judges exercising their 'broad discretion' over evidentiary

15   rulings in different phases of the same case and reaching contradictory results,"  102 F.3d 1494,

16   1515 (9th Cir. 1996).  The *Amarel* court reviewed the second judge's decision for abuse of

17   discretion.  The *Amarel* court expressly held "the interlocutory orders and rulings made pre-trial

18   by a district judge are subject to modification by the district judge at any time prior to final

19   judgment, and may be modified to the same extent if the case is reassigned to another judge."

20   *Amarel*, 102 F.3d at 1515.  It found a successor judge has "no imperative duty to follow the

21   earlier ruling—only the desirability that suitors shall, so far as possible, have reliable guidance

22   how to conduct their affairs." *Id.*

23           Later, in *Fairbank v. Cato Johnson*, the Ninth Circuit relied on *Castner v. First*

24   *Nat'l Bank of Anchorage*, 278 F.2d 376, 379–80 (9th Cir. 1960), which it termed "[t]he leading

25   Ninth Circuit case on the preclusive effect of an interlocutory holding by another court in the

26   same case." 212 F.3d 528, 530 (9th Cir. 2000).  Quoting *Castner*, the *Fairbank* court held a

27   judge has discretion to set aside a predecessor's decision if "cogent reasons" or "exceptional

28   circumstances" so require.  *Id.* (quoting 278 F.2d at 380); *accord Preaseau v. Prudential Ins. Co.*

15

1   *of Am.*, 591 F.2d 74, 79 (9th Cir. 1979).  In *Fairbank*, a California Superior Court judge had

2   denied the defendants' motion for summary judgment.  *Id.* at 530.  After two individual

3   defendants were dismissed, the action became completely diverse, and was removed to federal

4   district court.  *Id.*  The defendants moved again for summary judgment, this time under the

5   federal rule, and the federal court granted the motion.  *Id.*  The district court reconsidered

6   summary judgment because it found the federal rule on summary judgment differed from that of

7   California law.  *Id.* at 532–33.  The Ninth Circuit found these differences provided a "cogent

8   reason for reconsideration of the Superior Court's earlier decision" and affirmed.  *Id.* at 532.

9           Following *Fairbank,* in *Delta Savings Bank v. United States*, the Ninth Circuit

10  clarified that a second judge had discretion to review the decision of a predecessor in the same

11  case, but that the doctrine of the law of the case limited that discretion: "The prior decision should

12  be followed unless: (1) the decision is clearly erroneous and its enforcement would work a

13  manifest injustice, (2) intervening controlling authority makes reconsideration appropriate, or

14  (3) substantially different evidence was adduced at a subsequent trial."  265 F.3d 1017, 1027 (9th

15  Cir. 2001) (quoting *Jeffries v. Wood*, 114 F.3d 1484, 1489 (9th Cir. 1997)).  In *Delta Savings

16  Bank*, reconsideration was appropriate in light of intervening case law that called the previous

17  judge's decision into question; moreover, the first ruling "came in an earlier case with different

18  parties[,] which was voluntarily dismissed without prejudice."  *Id.*

19  V.      DISCUSSION

20          A.      Sovereign Immunity

21          The judge previously assigned to this case found plaintiffs' claims are covered by

22  the sovereign immunity waiver of 5 U.S.C. § 702, pursuant to the Administrative Procedure Act

23  (APA).  *See Duarte Nursery, Inc. v. U.S. Army Corps of Eng'r*, 17 F. Supp. 3d 1013, 1019 (E.D.

24  Cal. 2014).  This court revisits the issue here to address the intra-circuit split raised by the parties

25  on summary judgment.

26  /////

27  /////

28  /////

16

1    "Absent a waiver, sovereign immunity shields the Federal government and its

2    agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994).  Title 5 U.S.C. § 702 provides

3    a waiver of sovereign immunity in almost every circumstance to actions seeking non-monetary

4    relief based on unlawful agency action by government agencies and officials:

5               A person suffering legal wrong because of agency action, or
               adversely affected or aggrieved by agency action within the
6               meaning of a relevant statute, is entitled to judicial review thereof.
               An action in a court of the United States seeking relief other than
7               money damages and stating a claim that an agency or an officer or
               employee thereof acted or failed to act in an official capacity or
8               under color of legal authority shall not be dismissed nor relief
               therein be denied on the ground that it is against the United States
9               or that the United States is an indispensable party.

10   5 U.S.C. § 702; *see also Delano Farms Co. v. Cal. Table Grape Comm'n*, 623 F. Supp. 2d 1144,

11   1166 (E.D. Cal. 2009).  Although the APA provides a valid waiver for an agency action, there is

12   conflicting Ninth Circuit authority regarding whether this waiver is limited by § 704.  Section 704

13   states, in pertinent part, that only "[a]gency action made reviewable by statute and final agency

14   action for which there is no other adequate remedy in a court, are subject to judicial review."  5

15   U.S.C. § 704.

16          This court's predecessor previously found the C&D Letter to be an "agency

17   action" within the meaning of § 702, thus waiving the United States' sovereign immunity.

18   *Duarte Nursery*, 17 F. Supp. 3d at 1020 n.10.  The United States argues this decision was

19   erroneous, because  § 702 requires the agency action at issue to be a final agency action without

20   any adequate remedy in court.  ECF No. 138-1 at 10, 13 n.3.  Plaintiffs on the other hand contend

21   the Ninth Circuit recognizes a waiver of immunity under § 702 with mere "agency action" when

22   claims at issue are constitutional claims and do not seek monetary damages.  ECF No. 153 at 7.

23          As noted, the Ninth Circuit has yet to resolve whether final agency action is

24   required to seek review under § 702 of the APA.  *See Delano Farms Co.*, 623 F. Supp. 2d at

25   1166.  In *The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518 (9th Cir. 1989), which

26   involved a suit seeking injunctive relief brought against the Immigration and Naturalization

27   Service for violation of First and Fourteenth Amendment rights, the Ninth Circuit did not limit §

28   702's sovereign immunity waiver to "agency action" as defined in 5 U.S.C. § 551(13).  Shortly

17

1   after *Presbyterian Church* was decided, the Supreme Court decided *Lujan v. Nat'l Wildlife*

2   *Federation*, 497 U.S. 871, 882 (1990), which held that § 702 requires an "agency action" and

3   looked to 5 U.S.C. § 551, which defines the phrase as "an agency rule, order, license, sanction,

4   relief, or the equipment or denial thereof, or failure to act." 5 U.S.C. § 551(13). With the

5   definition of "agency action" established, the Supreme Court then went on to explain that:

6           [T]he person claiming a right to sue [under § 702] must identify
            some "agency action" that affects him in the specified fashion . . . .
7           When . . . review is sought not pursuant to specific authorization in
            the substantive statute but only under the general provisions of the
8           APA, the "agency action" in question must be "final agency
            action."
9

10  *Id.* at 882. In *Gallo Cattle Co. v. U.S. Dep't of Agriculture*, 159, F.3d 1194, 1198 (9th Cir. 1998),

11  the Ninth Circuit, though not discussing directly *Lujan*, noted that an agency action is reviewable

12  if "it constitutes 'final agency action' for which there is no other adequate remedy in a court."

13          Later cases decided by the Ninth Circuit after *Presbyterian Church*, *Lujan*, and

14  *Gallo Cattle* do not clarify whether, if at all, *Presbyterian Church*'s holding survives *Lujan* and

15  related Ninth Circuit precedent. In *San Carlos Apache Tribe v. United States*, 417 F.3d 1091,

16  1096 (9th Cir. 2005), the Ninth Circuit considered hypotheticals in which the two lines of

17  opinions could be reconciled in practice but ultimately sidestepped the issue. There, the San

18  Carlos Apache Tribe sought to maintain certain water levels in a reservoir in Arizona. *Id.* at

19  1092. The Tribe brought suit against various federal agency defendants under, among other

20  things, the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 *et seq.*, which requires

21  federal agencies to "take into account the effect of the[ir] undertaking[s] on any district, site,

22  building, structure, or object that is included or eligible for inclusion in the national Register."

23  *San Carlos*, 417 F.3d at 1092–93. The Tribe argued that its suit was properly brought as a private

24  action directly under the NHPA rather than under the APA. *Id.* at 1093. The Ninth Circuit

25  quoted *Presbyterian Church* for the general proposition that "in enacting the APA 'Congress was

26  quite explicit about its goals of eliminating sovereign immunity as an obstacle in securing judicial

27  review of the federal official conduct.'" *Id.* at 1096 (quoting *Presbyterian Church*, 870 at 524).

28

18

1    However, it then went on to find the case could not proceed directly under the NHPA, because

2    that would allow the San Carlos Apache Tribe to bypass the requirement of administrative review

3    under the APA, including that the agency action be final. *Id.* Importantly, the Circuit noted that

4    the NHPA does not create a private right of action, and absent that private right of action, a

5    plaintiff may not bypass the APA's procedural requirement even though § 702 may waive

6    sovereign immunity. *Id.* at 1098–99.

7           The Ninth Circuit followed the same line of reasoning in *Gros Ventre Tribe v.*

8    *United States*, 469 F.3d 801, 808–09 (9th Cir. 2006).  In that case, the plaintiffs, a handful of

9    Indian tribes, alleged federal agencies violated their obligations to protect tribal trust resources

10   when the agencies authorized and planned to expand two gold mines located upriver from the

11   tribes' lands. *Id.* at 803.  The plaintiffs argued they did not need to satisfy the "final agency

12   action" requirement under the APA, § 704. *Id.* at 808.  The Circuit recognized the conflict

13   between *Presbyterian Church*, 870 F.2d at 518, which held that § 702's waiver of sovereign

14   immunity is not limited to only "agency actions," and *Gallo Cattle*, 159 F.3d at 1194, which

15   stated instead that the APA's waiver of sovereign immunity is limited by, among other things,

16   § 704's "final agency action" requirement. *See Gros Ventre*, 469 F.3d at 808–09.  The *Gros*

17   *Ventre* decision declined to reconcile the conflict, however, because it found the tribes in that case

18   "did not have a common law cause of action for breach of trust" and "the statutes that the Tribes

19   cite authorize no private right of action." *Id.* at 809.  Therefore, the tribes had to "state their

20   claims within the confines of the APA." *Id.*  To do so, they had to challenge a "final agency

21   action." *See id.* at 814.  The Ninth Circuit reiterated the same reasoning in *Rattlesnake Coalition*

22   *v. EPA* but also did not directly address or resolve the conflict. *See* 509 F.3d 1095, 1103 (9th Cir.

23   2007) (explaining that "[w]hen a claim is brought pursuant to the APA, the agency action must be

24   a 'final agency action for which there is no other adequate remedy in court.' 5 U.S.C. § 704.").

25           As related to this case, none of the Ninth Circuit cases reviewed above addresses

26   whether a "final agency action" is still required if a plaintiff is raising constitutional challenges to

27   an agency action, and whether that agency would be subject to § 702's waiver of sovereign

28

19

1   immunity.  In the absence of clarification from the Circuit, a majority of district courts have

2   pointed to *Presbyterian Church* to reconcile the conflicting lines of opinions.

3           For example, in *Robinson v. Salazar*, 885 F. Supp. 2d 1002, 1027–28 (E.D. Cal.

4   2012), the court found that constitutional challenges to agency action fell within § 702's waiver

5   of sovereign immunity and did not require "final agency action."  In doing so, the court relied on

6   *Presbyterian Church*, 870 F.2d at 525, but found that unlike the plaintiffs in *Presbyterian Church*

7   who raised constitutional challenges to unlawful agency actions, the gravamen of the claims

8   plaintiffs raised in *Robinson* concerned defendant's "non-action or failure to act in accordance[]

9   with his administrative duties."  *Robinson*, 885 F. Supp. 2d at 1028.  "The[se] claims [raised]

10  issues within the realm of [Department of Interior] administrative duties of defendant Salazar."

11  *Id.*  The court thus found the government's sovereign immunity was not waived under the APA,

12  and the court had no subject matter jurisdiction.

13          Similarly, the court in *Valentini v. Shinseki*, 860 F. Supp. 2d 1079, 1101 (C.D. Cal.

14  2012), held where the claims alleged arise not under the APA, but instead concern agency actions

15  that violate another law, a "final agency action" is not required.  The court looked first at the text

16  of the statute, and found that § 702 does not limit the waiver of sovereign immunity to only "final

17  agency action."  *Id.* at 1100.  Rather, the plain language of the text "waives sovereign immunity

18  for any action alleging injury as a result of agency action (or inaction), so long as the suit does not

19  seek any money damages."  *Id.*  The court in *Valentini* then went on to reconcile *Presbyterian*

20  *Church and Gallo Cattle*.  It found that "[w]here the allegation is that the agency action violates

21  another—be it statutory, constitutional, or common law—the waiver of sovereign immunity is not

22  so limited" by the "final agency action" requirements under § 704, "but rather it is the broad,

23  unqualified waiver described in *Presbyterian Church* and suggested in the plain language of the

24  statute."  *Id.* at 1101.  Other courts have followed the same line of reasoning as the courts in

25  *Robinson* and *Valentini*.  *See, e.g.*, *Baxter v. United States*, No. 15-2138, 2016 WL 467499, at *2

26  n.1 (N.D. Cal. Feb. 8, 2016); *Cal. Sportfishing Protection Alliance v. U.S. Bureau of*

27  *Reclamation*, No. 15-00912, 2015 WL 6167521, at *8–9 (E.D. Cal. Oct. 20, 2015); *but see*

28  *Veterans for Common Sense v. Nicholson*, No. 07-3758, 2008 WL 114919, at *5 (N.D. Cal. Jan.

1    10, 2008) (finding generally that § 704 applies to § 702 without distinguishing constitutional

2    challenges to agency action).

3             The court here finds the reasoning in *Robinson* and *Valentini* persuasive, because

4    the plain language of the statute does not limit § 702's waiver of sovereign immunity in the way

5    United States argues.  The court concludes that where a party raises constitutional challenges to

6    agency action the action at issue does not need to be "final agency action."  Here, plaintiffs raise

7    Due Process challenges under the Fifth Amendment to the Army Corps' action, specifically by

8    challenging the C&D Letter.  Given the nature of this challenge, § 704 "final agency action" is

9    not required.  However, even if the waiver of sovereign immunity in § 702 applied only to the

10   extent that the agency action complained of was "final" under § 704, plaintiffs in this case have

11   shown there was a final agency action.  The Supreme Court, in a per curiam decision, has found

12   cease and desist orders issued under the CWA to be sufficiently final to trigger APA review.  *See*

13   *Sackett v. Envtl. Protection Agency*, 132 S. Ct. 1367, 1374 (2012).

14            Accordingly, the court has subject matter jurisdiction over the Due Process claims.

15   This decision does not alter the prior order in this case.  The court turns next to the merits of the

16   claims.

17            B.      Due Process

18   A procedural due process claim under the Fifth Amendment of the Constitution has two distinct

19   elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a

20   denial of adequate procedural protections.  *Brewster v. Bd. of Educ. of Lynwood Unified Sch.*

21   *Dist.*, 149 F.3d 971, 982 (9th Cir. 1998); *see also Arnett v. Kennedy*, 416 U.S. 134, 207 (1974).

22   The court first examines whether plaintiffs were deprived of a constitutionally protected liberty or

23   property interest.

24   /////

25   /////

26   /////

27   /////

28   /////

Plaintiffs argue they had an interest in their land and its use for wheat farming. ECF No. 136-1 at 2. The United States argues the C&D Letter did not effect a deprivation under the Fifth Amendment:

> '[C]ease and desist' are not magic words that render an otherwise unenforceable document a deprivation under the Fifth Amendment, and a document that merely announces an agency's view that there has been a violation of law and the possibility that a deprivation may occur at a later date does not take away anything.

ECF No. 138-1 at 14.

The court's predecessor found *Guatay Christian Fellowship v. Cty. of San Diego*, 670 F.3d 957 (9th Cir. 2011) did not control the result in this case, because the facts in *Guatay* are distinguishable. Specifically, the prior judge found *Guatay* not controlling in his discussion of "ripeness," which also touched on due process. *Duarte Nursery*, 17 F. Supp. 3d at 1022. His order stated, in relevant part:

> Plaintiffs [in *Guatay*] could have sought a permit allowing them to keep their church where it was, and (2) they had available an administrative appeal of the cease and desist order.

*Id.* In contrast, plaintiffs in this case had no opportunity to challenge the C&D Letter, which deprived them of their right to farm the Property. *Id.* This court disagrees and finds *Guatay* controlling. Any factual distinctions are irrelevant because plaintiffs have not suffered a deprivation to begin with.

In *Guatay*, the county defendant issued a notice of violation (NOV) to the plaintiff, advising the use of the building at issue could not be changed without a modification of use permit (MOU), and ordering the plaintiff to cease using the building within thirty (30) days of notice. The NOV also warned the use of the property could result in penalties of up to $2,500 per day for each day after the 30-day period. 670 F.3d at 964. A subsequent letter from the county defendant again asked the plaintiff to cease conducting religious assemblies on the property until a permit was granted. *Id.* at 965.

/////

/////

22

1    Here, the C&D Letter similarly advised plaintiffs their activity, conducted without

2    a permit, was in violation of the CWA.  Specifically, the letter provided,

3            You are hereby directed to cease and desist all work in waters of the
             United States until this violation is resolved.  We are conducting an
4            investigation to determine the impact of this work as it relates to
             public interest and the appropriate course of action to remedy the
5            situation.  Potential enforcement actions, in addition to or in lieu of
             fines, penalties and imprisonment, include directing removal of the
6            unauthorized work and restoration of the site . . . .  Prompt
             voluntary restoration of the site in accordance with a Corps-
7            approved plan may preclude some or all of these actions.

8    C&D Letter at 1.  There is no doubt the C&D Letter is strongly worded.  However, strong words

9    alone do not amount to a distinct deprivation of a constitutionally protected liberty or property

10   interest, particularly where as here they point to the possibility of "potential future enforcement."

11   *See Guatay*, 670 F.3d at 983–84.  As the Ninth Circuit in *Guatay* pointed out, the county

12   defendant there would have had to bring an enforcement action in court to actually enforce the

13   zoning regulation.  The facts of this case are analogous.  The Army Corps would have had to

14   request the EPA or the DOJ bring an enforcement action to actually enforce the CWA.  The Army

15   Corps has sought enforcement now by filing its counterclaim to this action.  However,

16   enforcement had not occurred at the time plaintiffs received the C&D Letter.  The court finds that

17   while plaintiffs' reaction to the Army Corps' communication in the form of the C&D Letter

18   assumed enforcement was forthcoming, such a reaction does not convert the threatened

19   enforcement to a deprivation of a liberty or property interest cognizable under the Due Process

20   Clause.  *Id.* at 984.  Without a deprivation of a protected interest there can be no procedural due

21   process claims based on the C&D Letter, because plaintiffs' procedural due process rights cannot

22   have been violated at the time the letter was received.  *Id.*

23           The court finds the prior decision in this respect clearly erroneous such that to let it

24   stand would work a manifest injustice.  The court GRANTS the United States' motion for

25   summary judgment on plaintiffs' Due Process claims.

26

27

28

                                                23

1    C.    Clean Water Act (CWA)

2           The court next considers the United States' counterclaim, which alleges plaintiffs

3    violated the CWA.  The CWA is a strict liability statute.  *Waterkeepers N. Cal. v. Ag Indus. Mfg.,*

4    *Inc.*, No. 00-1967, 2005 WL 2001037, at *13 (E.D. Cal. Aug. 19, 2005).  It generally prohibits

5    the discharge of pollutants by any person into "navigable waters" or "waters of the United States"

6    without a National Pollution Discharge Elimination System (NPDES) permit.[5]  33 U.S.C.

7    §§ 1311(a), 1362(7); *see Headwaters, Inc. v. Talent Irrigation Dist.*, 243 F.3d 526, 530 (9th Cir.

8    2001).  The NPDES permit program allows a polluter with a permit to discharge a specified

9    amount of pollutant.  *Id.* at § 1342; *Headwaters*, 243 F.3d at 530.  Thus to establish a violation of

10   the CWA's NPDES permit requirement, the United States must show plaintiffs/counter-

11   defendants (1) discharged (2) a pollutant (3) to navigable waters (4) from a point source without a

12   permit.  *See Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th

13   Cir. 1993).  It is not disputed here that there was no permit.  The United States thus need only

14   establish plaintiffs discharged a pollutant to navigable waters from a point source.

15          The court first addresses whether John Duarte can be held individually liable for

16   violation of the CWA.

17          1.    Individual Liability

18          Plaintiffs do not contest that the Nursery was responsible for the activities

19   underlying the counterclaim.  However, plaintiffs argue John Duarte cannot be held individually

20   liable because he did not personally conduct the tillage that allegedly violated the CWA.

21   Plaintiffs argue the statutory language in the CWA provides specifically that "the discharge of

22   any pollutant by any person shall be unlawful," but John Duarte did not personally discharge any

23   pollutant.  Plaintiffs further contend that though under the CWA a "person" includes a

24

---

25          [5] The CWA defines "navigable waters" as "waters of the United States."  33 U.S.C.
     § 1362(7).  And the EPA has defined "waters of the United States" to include: "all other waters
26   such as . . . rivers, streams (including intermittent streams) . . . [and] tributaries of [those] waters."
     40 C.F.R. § 122.2; *see also United States v. Phillips*, 367 F.3d 846, 851–52, 855–56 (9th Cir.
27   2004) (CWA jurisdiction could be exercised over a creek emptying into a larger creek, which in
     turn flowed into a navigable river).
28

1  corporation, John Duarte nevertheless cannot be held liable as an individual because the United

2  States did not plead reliance on the Responsible Corporate Officer Doctrine (RCOD).  Even if

3  pled, the RCOD does not apply in a civil enforcement action based on the CWA.  Finally, should

4  the RCOD apply, plaintiffs argue John Duarte had no knowing intent as required.

5          As noted, the CWA prohibits discharge of pollutants into the waters of the United

6  States by any "person" without a permit.  The term "person" is defined to mean "an individual,

7  corporation, partnership, association, State, municipality, commission, or political subdivision of

8  a State, or any interstate body."  33 U.S.C. § 1362(5).  While in the context of criminal

9  enforcement, the term "person" includes any responsible corporate officer, *id.* § 1319(c)(6), the

10  CWA's civil enforcement provision does not expressly reference responsible corporate officers.

11  *Compare id.* § 1362(5) *with* § 1319(c)(6).  Although the Ninth Circuit has yet to decide the issue,

12  other courts have found the RCOD applies in both criminal and civil actions, *see, e.g.*, *United*

13  *States v. Hodges X-Ray, Inc.*, 759 F.2d 557 (6th Cir. 1985), and in particular civil CWA actions,

14  *United States v. Osborne*, No. 11-1029, 2012 WL 1096087, at *3 (N.D. Ohio Mar. 30, 2012).

15          And the RCOD has been applied in both criminal and civil CWA cases by district

16  courts within this Circuit.  In *Ag Indus. Mfg., Inc.*, 2005 WL 2001037, at *13, the court

17  considered the Ninth Circuit's application of the responsible corporate officer doctrine in the

18  context of a criminal CWA case.  In *United States v. Iverson*, the case considered by that court,

19  the defendant was the president of a company that manufactured chemical products.  *Id.* at *12.

20  The defendant faced criminal charges under the CWA for personally ordering the discharge of

21  wastewater residue.  Importantly, the *Ag* court noted that criminal liability can attach to all parties

22  who share responsibility in "the furtherance of the transaction which the statute outlaws."  *Id.*

23  (citing *United States v. Dotterweich*, 320 U.S. 277, 284 (1943)).  It held that while *Iverson* was a

24  criminal action "with facts more egregious than those of the case at bar," the RCOD nonetheless

25  applies in both criminal and civil cases.  Following the same line of reasoning, the court in

26  *Humboldt Baykeeper v. Simpson Timber Co.*, also applied RCOD to a civil CWA action. *See* No.

27  06-04188, 2006 WL 3545014, at *4 (N.D. Cal. Dec. 8, 2006).  Also citing *Iverson*, it similarly

28  found that "individuals whose acts or omissions have led to such pollution may be held

25

1  responsible individually, notwithstanding the fact that they may have been acting in their capacity

2  as an employee or officer of a company or entity that owns the property in question or conducts

3  business on it." *Id.*  In *N. Cal. River Watch v. Oakland Maritime Support Servs., Inc.*, a civil

4  action, the court cited *Humboldt Baykeeper* and found that "under the Clean Water Act, penalties

5  may be imposed against individuals who are in positions of authority at polluting companies."

6  No. 10-03912, 2011 WL 566838, at *4 (N.D. Cal. Feb. 14, 2011).  The court finds persuasive the

7  rationale for consistent application of the RCOD in civil CWA cases, and agrees that a corporate

8  officer with authority over the activities underlying alleged violations should not escape liability

9  by virtue of having delegated certain implementing tasks.  *See Ag Indus. Mf., Inc.*, 2005 WL

10  2001037, at *12–13.  The court finds the RCOD applicable here.

11          The question then is whether John Duarte is a responsible corporate officer.  The

12  Ninth Circuit has held that a person is a responsible corporate officer if he or she has authority to

13  exercise control over the corporation's activity that is causing discharges.  *Iverson*, 162 F.3d at

14  1022–26.  It is undisputed John Duarte was the president of the Nursery when it purchased the

15  2,000 acres of real estate in Tehama County, California.  NRDP No. 4; John Duarte Dep.

16  21:11-13, 22–24.  And in 2012 he had significant input into the activities conducted on and

17  precautions taken with respect to the real estate.  John Duarte Dep. 23:7–15.  It was also his

18  decision whether to follow up with the Army Corps after Kelley's call in December 2012 and

19  again after the Nursery received the subsequent C&D Letter.  James Duarte Dep. 154:4–7,

20  165:21–24, 181:6–10.  John Duarte authorized and controlled the Nursery's activity on the

21  Property, including the tillage by Unruh.  *See* John Duarte Dep. 21:11–25:11.  Under the RCOD,

22  it is sufficient for John Duarte to have authority over the tillage operations without actually

23  operating the equipment.  *See Iverson*, 162 F.3d at 1022–26.  Accordingly, John Duarte is a

24  responsible corporate officer.

25          Finally, the CWA is a strict liability statute, thus whether John Duarte had intent or

26  not is irrelevant under the CWA.  And the United States' counterclaim pleads John Duarte was

27  the President and co-owner of the Nursery, Countercl. ¶ 29, a "person" under the CWA, *id.* ¶ 90,

28  who carried out deep ripping activities, *id.* ¶ 100, and who is jointly and severally responsible for

1   CWA violations by the Nursery, *id.* ¶ 105.  Plaintiffs were sufficiently put on notice of the

2   counterclaim against John Duarte; the United States has not raised a new theory that it did not

3   plead.

4           The court finds John Duarte can be held individually liable.  It next turns to

5   whether summary judgment is warranted on the CWA counterclaim.

6                   2.      Discharge of Pollutant

7           As noted, the United States must show there is no material dispute that

8   plaintiffs/counter-defendants (1) discharged (2) a pollutant (3) to navigable waters (4) from a

9   point source, with the lack of a permit undisputed.  *See Comm. to Save Mokelumne River*, 13 F.3d

10  at 308.  For the purposes of this order, the first two elements can be merged.  The question the

11  court must answer is whether the addition of soil to land, as here, is considered a discharge of

12  pollutant.  The CWA defines the "discharge of pollutant" as "any addition of any pollutant to

13  navigable waters from any point source."  33 U.S.C. § 1362.  Under the CWA, "pollutant"

14  includes "dredged spoil," "biological materials," "rock," "sand," and "cellar dirt."  *Id.* § 1362(6).

15  Courts have also looked to the CWA regulations, which identify additional categories of

16  pollutants.  In *Avoyelles Sportsmen League, Inc. v. March*, the Fifth Circuit noted that "fill

17  material" can also constitute a pollutant under § 1362, with reference to 33 C.F.R. § 323.2(e)

18  (previously 33 C.F.R. § 323.2(m)).  715 F.2d 897, 922–24 (5th Cir. 1983).  This regulation

19  defines fill material to mean,

20          (e)(1) . . . material placed in waters of the United States where the
            material has the effect of:
21

22          (i) Replacing any portion of a water of the United States with dry
            land; or

23          (ii) Changing the bottom elevation of any portion of a water of the
            United States.
24

25          (2) Examples of such fill material include, but are not limited to:
            rock, sand, soil, clay . . . overburden from mining or other
            excavation activities . . . .
26

27  33 C.F.R.§ 323.2(e).  The regulations thus explicitly provide that fill material can include "soil."

28  The regulations go on to explain that,

                                            27

1
2
3
4
5

> The term discharge of fill material means the addition of fill material into waters of the United States.  The term generally includes, without limitation, the following activities: Placement of fill that is necessary for the construction of any structure or infrastructure in a water of the United States; the building of any structure, infrastructure, or impoundment requiring rock, sand, dirt or other material for its construction; site-development fills for recreational, industrial, commercial, residential, or other uses . . . .

6   33 C.F.R. § 323.2(f).  Discharge of fill material, however, does not include "plowing, cultivating,

7   seeding and harvesting for the production of food, fiber, and forest products . . . ." *Id.*

8          In *Avoyelles*, the Fifth Circuit also considered the regulations' definition of

9   "dredged material," or "dredged spoils," which provided that "dredged material" is "material that

10  is excavated or dredged from the waters of the United States."  33 C.F.R. § 323.2(c).  Although

11  the term was not disputed in *Avoyelles*, the court nevertheless noted that activities such as

12  "digging of ditches and holes" would constitute "dredging."  *Avoyelles*, 715 F.2d at 925.

13  Specifically, § 323.2(d)(1) explains that "the term discharge of dredged material means any

14  addition of dredged material into, including redeposit of dredged material other than incidental

15  fallback within, the waters of the United States."  33 C.F.R. § 323.2(d)(1).  "Discharge of dredged

16  material" includes,

17
18

> (i) The addition of dredged material to a specific discharge site located in waters of the United States;

19

> . . .

20
21
22

> (iii) Any addition, including redeposit other than incidental fallback, of dredged material, including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation.

23  33 C.F.R. § 323.2(d)(1)(i), (iii).  As with discharge of filled material, discharge of dredged

24  material also allows for a farming exemption.  *Id.* § 323.2(d)(3)(iii).  The court discusses both

25  exemptions below.

26          The Ninth Circuit has agreed with *Avoyelles* regarding the definition of both the

27  discharge of fill and dredged material, and has further clarified the definition of "discharge of

28  dredged material." *Borden Ranch P'ship v. U.S. Army Corps of Eng'r*, 261 F.3d 810, 814 (9th

1   Cir. 2001) (citing *United States v. Deaton*, 209 F.3d 331, 335–36 (4th Cir. 2000)).  In so doing,

2   the Ninth Circuit has observed, "It is of no consequence that what is now dredged spoil was

3   previously present on the same property . . . .  What is important is that once that material was

4   excavated from the wetland, its redeposit in that same wetland *added* a pollutant where none had

5   been before." *Borden Ranch*, 261 F.3d at 814 (citing *Deaton*, 209 F.3d at 335–36 (emphasis in

6   the original)).  Echoing both the Fourth and Fifth Circuits, the Ninth Circuit is clear that "soil" is

7   a pollutant:  "Plain dirt, once excavated from waters of the United States, could not be

8   redeposited into those waters without causing harm to the environment." *Borden Ranch*,

9   261 F.3d at 814 (citing *Deaton*, 209 F.3d at 336).

10          The two cases cited by plaintiffs are inapposite because they concern redepositing

11   water and not soil. *See Los Angeles Cnty. Flood Control Dist. v. Natural Res. Defense Council,*

12   *Inc.*, 133 S. Ct. 710, 712 (2013); *S. Fla. Water Mgmt. Dist. v. Miccosuke Tribe of Indians*, 541

13   U.S. 95, 106 (2004).

14          In sum, soil is a pollutant.  And here, plaintiffs instructed Unruh to till and loosen

15   the soil on the Property.  Unruh Dep. 55:4–6, 13–15, 118:4–9.  The equipment Unruh used caused

16   the material, in this case soil, to move horizontally, creating furrows and ridges.  DRCWA No.

17   29.  This movement of the soil resulted in its being redeposited into waters of the United States, at

18   least in areas of the wetlands as delineated by NorthStar on the Property. *See* DRCWA Nos. 28–

19   29.  Thus, the Nursery's activities discharged a pollutant.

20                   3.      <u>Navigable Waters</u>

21          The court next considers whether the waters on the Property were indisputably

22   "navigable waters" under the CWA.  While a majority of the Supreme Court has yet to agree on

23   an explanation of when wetlands are sufficiently adjacent to navigable waters to confer CWA

24   protection, the narrowest grounds of agreement among members of the Court were established in

25   *Rapanos v. United States*, 547 U.S. 715 (2006).  In *Rapanos*, a 4-4-1 plurality opinion, the

26   Supreme Court considered the definition of "navigable waters" under the CWA.  Justice

27   Kennedy, casting the fifth vote for reversal along with four other Justices, concurred only in the

28   judgment.  His concurrence provides the narrowest ground on which a majority of Justices would

agree if required to choose, in almost all cases.  *See N. Cal. River Watch v. City of Healdsburg*,

496 F.3d 993, 999 (2007) ("to qualify as a regulable water under the CWA, the body of water

itself need not be continuously flowing, but that there must be a "significant nexus" to a waterway

that is in fact navigable.").  Following Justice Kennedy's concurrence, the Ninth Circuit adopted

his "substantial nexus" test:

> [A] "mere hydrologic connection should not suffice in all cases; the connection may be too insubstantial for the hydrologic linkage to establish the required nexus with navigable waters as traditionally understood."  Rather, the "required nexus must be assessed in terms of the statute's goals and purposes," which are to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

*City of Healdsburg*, 496 F.3d at 1000 (citing *Rapanos*, 547 U.S. at 784–85; citations omitted).

The Ninth Circuit directs courts deciding whether there is a hydrological linkage to look for a

"reasonable inference of ecological interconnection."  *Id.*  A "significant nexus" exists where

wetlands have a significant effect on the chemical, physical, and biological integrity of the nearby

navigable waters.  496 F.3d at 1001.

Here, in its July 2012 Delineation, NorthStar noted:

> Wetlands within the [Property] hold floodwaters and intercept sheet flow from uplands, releasing water in a more consistent manner. These wetlands collect and hold water during significant rain events acting as a biological filter collecting the first flush prior to filtering into [downstream waters].

NorthStar 2012 Draft at 11.  The Army Corps' investigation report also noted that

> The wetlands and water on-site are hydrologically connected . . . and help to moderate flood flows due to storm events, provide filtration to sediments and pollutants prior to entering Coyote Creek and are designated critical habitat and are known to support the Federally-listed vernal pool fairy shrimp and . . . tadpole shrimp.

Army Corps Expert Report at 2.  The wetlands within the Property thus have physical

connections to Coyote Creek, a tributary of the traditional navigable waters of the Sacramento

River.  *See City of Healdsburg*, 496 F.3d at 1000.  In addition, the United States' expert report

provides that the dissolved and particulate organic carbon and dissolved nutrients on the Property

are related to the Coyote Creek/Oak Creek system, which flows to the Sacramento River.  ECF

No. 87-3 at 151.  Plaintiffs do not point to any "specific facts showing that there is a genuine

1    issue for trial." *Celotex*, 477 U.S. at 324.  The court thus finds that the wetlands on the Property

2    have a "significant nexus" with the Sacramento River, which is a traditionally navigable

3    waterway.

4                        4.      Point Source

5            Next, the court considers whether the Equipment qualifies as a "point source"

6    under the CWA.  The CWA defines the term "point source" to mean, "[a]ny discernible, confined

7    and discrete conveyance, including but not limited to any . . . conduit. . ., [or] container. . . from

8    which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  Under the broad statutory

9    language, courts have found "bulldozers and backhoes" to be "point sources" under the CWA,

10   because they collect and pile material that may eventually find its way into the waters of the

11   United States.  *Borden Ranch*, 261 F.3d at 815 (citing *Avoyelles*, 715 F.2d at 922); *see also*

12   *United States v. Akers*, 785 F.2d 814, 817–20 (9th Cir. 1986) (grader, tractor pulling discs, and a

13   ripper are point sources); *Deaton*, 209 F.3d at 333 (sidecasting, whereby excavated dirt is piled on

14   either side of a ditch, through the use of a backhoe, front-end loader, and bulldozer is a point

15   source).

16           Here, Unruh used the Equipment, a 360-horsepower International Harvester Case

17   Quadtrac 9370 with Wilcox ripper, NSC 36-24-7, as an attachment for tilling.  DRCWA No. 23;

18   Unruh Dep. 93:6–94:5.  The Equipment has seven shanks with 24-inch spacing in between the

19   shanks, and each shank is 36 inches long.  Unruh Dep. 93:17–94:5.  Material moved horizontally,

20   and the shanks created furrows and ridges to the left and right of each furrow.  DRCWA No. 29.

21   The Equipment did not have to be an immobile "container," but could be any means of transport

22   in which a pollutant is carried by a "discernible, confided, and discrete conveyance" into the

23   waters of the United States.  *See S. Fla. Water Mgmt. Dist. V. Miccosukee Tribe*, 541 U.S. 95, 105

24   (2004).  The Equipment loosened and moved the soil horizontally, pulling the dirt out of the

25   wetlands and redepositing it there as well.  *See Deaton*, 209 F.3d at 335.  The Equipment, with

26   the ripper attachment, is a "point source" under the CWA.

27

28

                                                    31

1        5.        Exemption

2            Plaintiffs/counter-defendants bear the burden of proving whether their discharge

3    falls under any statutory exemption. *City of Healdsburg*, 496 F.3d at 1001.  Here, plaintiffs claim

4    their activities on the Property were exempted as "part of an established (i.e., on-going) farming

5    . . . operation" under 33 U.S.C. § 1344(f)(1) and 33 C.F.R. § 323.4(a)(1)(i)–(ii).  They also argue

6    their discharge was "recaptured" under 33 U.S.C. § 1344(f)(2).  The court first considers the

7    farming exemption.

8            a)        33 U.S.C. § 1344(f)(1)

9            As previously mentioned, certain activities are exempt from the definition of

10   discharge of fill or dredged material.  Specifically § 1344(f)(1) exempts certain activities in

11   connection with farming, silviculture and ranching from the NPDES permitting requirement.  The

12   exemption provides in detail as follows:

13           (a) General.  Except as specified in paragraphs (b) and (c) of this
             section, any discharge of dredged or fill material that may result
14           from any of the following activities is not prohibited by or
             otherwise subject to regulation under section 404:
15

16           (1)(i) Normal farming . . . activities such as plowing, seeding,
             cultivating, minor drainage, and harvesting for the production of
17           food, fiber, and forest products, or upland soil and water
             conservation practices, as defined in paragraph (a)(1)(iii) of this
18           section.

19           (ii) To fall under this exemption, the activities specified in
             paragraph (a)(1)(i) of this section must be part of an established
20           (i.e., on-going) farming . . . operation and must be in accordance
             with definitions in § 323.4(a)(1)(iii).  Activities on areas lying
21           fallow as part of a conventional rotational cycle are part of an
             established operation.  Activities which bring an area into farming
22           . . . are not part of an established operation.  An operation ceases to
             be established when the area on which it was conducted has been
23           converted to another use or has lain idle so long that modifications
             to the hydrological regime are necessary to resume operations.  If
24           an activity takes place outside the waters of the United States, or if
             it does not involve a discharge, it does not need a section 404
25           permit, whether or not it is part of an established farming . . .
             operation.

26           . . .

27           (B) Harvesting means physical measures employed directly upon
             farm, forest, or ranch crops within established agricultural and
28           silvicultural lands to bring about their removal from farm, forest, or

32

ranch land, but does not include the construction of farm, forest, or ranch roads.

. . .

(D) Plowing means all forms of primary tillage, including moldboard, chisel, or wide-blade plowing, discing, harrowing and similar physical means utilized on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops.  The term does not include the redistribution of soil, rock, sand, or other surficial materials in a manner which changes any area of the waters of the United States to dry land.  For example, the redistribution of surface materials by blading, grading, or other means to fill in wetland areas is not plowing.   Rock crushing activities which result in the loss of natural drainage characteristics, the reduction of water storage and recharge capabilities, or the overburden of natural water filtration capacities do not constitute plowing. Plowing as described above will never involve a discharge of dredged or fill material.

(E) Seeding means the sowing of seed and placement of seedlings to produce farm, ranch, or forest crops and includes the placement of soil beds for seeds or seedlings on established farm and forest lands.

. . .

(c) Any discharge of dredged or fill material into waters of the United States incidental to any of the activities identified in paragraphs (a)(1) through (6) of this section must have a permit if it is part of an activity whose purpose is to convert an area of the waters of the United States into a use to which it was not previously subject, where the flow or circulation of waters of the United States may be impaired or the reach of such waters reduced.  Where the proposed discharge will result in significant discernible alterations to flow or circulation, the presumption is that flow or circulation may be impaired by such alteration.  For example, a permit will be required for the conversion of a cypress swamp to some other use or the conversion of a wetland from silvicultural to agricultural use when there is a discharge of dredged or fill material into waters of the United States in conjunction with construction of dikes, drainage ditches or other works or structures used to effect such conversion.   A conversion of a section 404 wetland to a non-wetland is a change in use of an area of waters of the United States. A discharge which elevates the bottom of waters of the United States without converting it to dry land does not thereby reduce the reach of, but may alter the flow or circulation of, waters of the United States.

33 C.F.R. § 323.4(a), (c).  In sum, while § 1344(f)(1) provides a farming exemption, to fall under

the exemption, the farming activities must be "established and ongoing."  A farming operation

ceases to be established when the area has been converted to another use, or modifications to the

33

1   "hydrological regime" are necessary for continue the farming operations.  33 C.F.R.

2   § 323.4(a)(1)(ii).  In addition, even if the farming activities are established and ongoing, if they

3   convert waters of the United States into a new use to which they were not previously subjected, or

4   impair the flow or circulation of waters of the United States, then a permit is required.  *Id.*

5   § 323.4(c).

6          Here, there is no evidence the Property supported farming activity between 1988

7   and the summer of 2012.  Stokely Expert Report at 6–7.  Unruh, who performed the tillage

8   service for the Nursery and John Duarte in 2012, stated the ground on the Property was hard and

9   difficult to penetrate from the grazing activities.  Unruh Dep. 98:9–24.  Plaintiffs have provided

10  no support to show grazing is analogous to the farming activity they conducted beginning in

11  2012.  The court is not persuaded that, after nearly twenty-four years of no activity that meets the

12  applicable definition of farming, the tillage and planting of wheat by plaintiffs can be considered

13  a continuation of established and ongoing farming activities.

14         Moreover, the aerial photos provided in the Stokely Expert Report show a

15  substantial amount of wetlands impacted by the tillage and planting activities.  Stokely Expert

16  Report at 7–8, 22–55.  The photos demonstrate substantial changes in the hydrological regime,

17  which are prohibited if a party is to benefit from the farming exemption under § 1344(f)(1).  *Cf.*

18  *Akers*, 785 F.2d at 819–20 (court rejects the exemption for the wetland portion of the subject farm

19  because of substantial hydrological alteration).

20             b)      33 U.S.C. 1344(f)(2)

21         Notwithstanding its conclusion above, the court also considers the recapture

22  provision of 33 U.S.C. § 1344(f)(2), which provides:

23         Any discharge of dredged or fill material into the navigable waters
           incidental to any activity having as its purpose bringing an area of
24         the navigable waters into a use to which it was not previously
           subject, where the flow or circulation of navigable waters may be
25         impaired or the reach of such waters be reduced, shall be required
           to have a permit under this section.
26

27  33 U.S.C. § 1344(f)(2).  The statutory provision expressly notes that "any" discharge of dredge or

28  fill material into the navigable waters requires a permit.  Thus, plaintiffs' argument that all the

34

1    existing wetlands on the Property still exist, and no waters of the United States have been

2    converted to dryland, ECF No. 128, ignores not only the statute but also the purpose of the CWA

3    to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

4    33 U.S.C. § 1251(a).  The CWA does not simply prohibit the complete conversion of waters of

5    the United States.  Even under the farming exemption, a discharge of dredged or fill material

6    incidental to the farming activities that impairs the flow of the waters of the United States still

7    requires a permit, because it changes the chemical, physical and biological integrity of the waters.

8    33 C.F.R. § 323.4(c); 33 U.S.C. § 1344(f)(2).

9           6.   Summary

10          The Nursery and John Duarte, through Munson, hired Unruh to till the Property,

11   with the exception of the southwest corner, which was cordoned off by a fence.  Unruh Dep.

12   55:22–56:7.  The Equipment did not avoid all of the wetlands delineated by NorthStar in 2012.

13   DRCWA No. 28; NRDP No. 31.  The Equipment moved dirt from around and in the wetlands

14   before redepositing it back into the wetlands on the Property.  The wetlands on the Property have

15   a "significant nexus" to Coyote Creek, which is a tributary of the Sacramento River, a

16   traditionally navigable waterway.  The tillage was not part of an established and ongoing farming

17   activity.

18          Accordingly, the United States has established each element of a violation and

19   plaintiffs have not established an exemption applies.  The court GRANTS the United States'

20   motion for summary judgment on its CWA counterclaim.

21       D.   Retaliation

22          Plaintiffs allege in the complaint that the United States violated the First

23   Amendment by retaliatory prosecution.[7]  SAC ¶¶ 115–121.  Specifically, plaintiffs allege that

24   public statements show the United States filed the counterclaim because plaintiffs filed their

25   complaint.  SAC ¶¶ 118–120.  The United States contends: (1) the claim should be dismissed

26   because the court does not have subject matter jurisdiction over this claim because there has been

27

28   ———————————
     [7] The Second Amended Complaint also asserts the retaliatory prosecution claim against
     Bostick and Lynch, but does not clarify who they are.

                                        35

1    no waiver of sovereign immunity; or (2) the court should grant summary judgment because there

2    is a lack of evidence, and (3) plaintiffs have not suffered an injury.  *See generally* ECF No. 134-1.

3    The court first looks at whether it has subject matter jurisdiction over plaintiffs' retaliatory

4    prosecution claim.

5              Where a party raises constitutional challenges to agency action as here, and as

6    decided above, the action at issue does not need to be "final agency action."  Thus, the issue here

7    is whether a civil enforcement action by the DOJ, after accepting referral from the Army Corps, is

8    "agency action" within the meaning of § 702.

9              The party claiming the right to sue under § 702 must identify an "agency action"

10   that affects him or her.  5 U.S.C. § 702; *see also Lujan*, 497 U.S. at 882.  Again, "agency action"

11   includes: an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or

12   failure to act.  5 U.S.C. § 551.  As a threshold matter, the APA does not apply if the "agency

13   action is committed to agency discretion by law."  5 U.S.C. § 701(a)(1), (2); *see also Merrill*

14   *Ditch-Liners, Inc. v. Pablo*, 670 F.2d 139, 140 (9th Cir. 1982).  And the Ninth Circuit has held,

15   "litigation decisions are generally committed to agency discretion by law, and are not subject to

16   judicial review under the APA."  *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1339 (9th

17   Cir. 1992) (citing *Heckler v. Chaney*, 470 U.S. 821, 832–33 (1985)); *see also City of Oakland v.*

18   *Holder*, 901 F. Supp. 2d 1188, 1195 (N.D. Cal. 2013), *aff'd sub nom.  City of Oakland v. Lynch*,

19   798 F.3d 1159 (9th Cir. 2015) ("[F]iling of a civil action does not fit within the APA's definition

20   of agency action.").

21             Plaintiffs have the burden to show the United States has waived its sovereign

22   immunity.  *Dunn & Black, P.S. v. United States*, 492 F.3d 1084, 1088 (9th Cir. 2008).  They have

23   not met this burden in this respect as they have not shown that the counterclaim falls under § 702

24   or why it should not be barred by § 701(a)(1).  The cases cited by plaintiffs are inapposite as they

25   deal with whether an administrative complaint is a "final agency action," *see, e.g.*, *F.T.C. v.*

26   *Standard Oil of Cal.*, 449 U.S. 232 (1980), and adverse publicity, *see, e.g.*, *Indus. Safety*

27   *Equipment Ass'n, Inc. v. E.P.A.*, 837 F.2d 1115, 1119 (D.C. Cir. 1988).  ECF No. 154 at 10.

28

1         The court finds the United States has not waived sovereign immunity as to

2 plaintiffs' retaliatory prosecution claim, and the claim must be DISMISSED against the Army

3 Corps and the United States.  The court need not reach the merits of the claim.

4 VI.    <u>CONCLUSION</u>

5         The court GRANTS the United States' motion for summary judgment on

6 plaintiffs' Due Process claims.  The court also GRANTS the United States' motion for summary

7 judgment on its CWA counterclaim.  The court GRANTS the United States' motion to dismiss on

8 plaintiffs' retaliatory prosecution claim WITHOUT LEAVE TO AMEND.

9         IT IS SO ORDERED.

10  DATED:  June 10, 2016

11

12

13                  UNITED STATES DISTRICT JUDGE