M. REED HOPPER (Cal. Bar No. 131291)
ANTHONY L. FRANÇOIS (Cal. Bar No. 184100)
Pacific Legal Foundation
930 G Street
Sacramento, CA  95814
 (916) 419-7111 (p)
 (916) 419-7747 (f)
mrh@pacificlegal.org
alf@pacificlegal.org
*See next page for additional attorneys for Plaintiffs and Counterclaim-Defendants*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUARTE NURSERY, INC., a California Corporation;  and JOHN DUARTE, an individual,<br><br>         Plaintiffs,<br><br>v.<br><br>UNITED STATES ARMY CORPS OF ENGINEERS,<br><br>         Defendant. | No.  2:13−CV−02095−KJM−AC (TEMP)<br><br>**REPLY IN SUPPORT OF MOTION FOR RECONSIDERATION, OR FOR CERTIFICATION OF INTERLOCUTORY APPEAL AND FOR A STAY** |
| UNITED STATES OF AMERICA<br>         Counterclaim- Plaintiff,<br><br>v.<br><br>DUARTE NURSERY, INC., a California Corporation;  and JOHN DUARTE, an individual,<br><br>         Counterclaim- Defendants. | |

*Additional attorneys for*
*Plaintiffs and Counterclaim-Defendants*

DAVID M. IVESTER (Cal. Bar No. 76863)
PETER PROWS (Cal. Bar No. 257819)
MAX ROLLENS (Cal. Bar No. 308984)
Briscoe Ivester & Bazel LLP
155 Sansome Street, Seventh Floor
San Francisco, CA  94104
 (415) 402-2700 (p)
 (415) 398-5630 (f)
divester@briscoelaw.net
pprows@briscoelaw.net

GERALD E. BRUNN (Cal. Bar No. 107004)
Law Offices of Brunn & Flynn
928 12th Street, Suite 200
Modesto, CA  95354
 (209) 521-2133 (p)
 (209) 521-7584 (f)
gbrunn@brunn-flynn.com

**TABLE OF CONTENTS**

I. INTRODUCTION ..................................................................................................1

II. DUARTE PLOWED..............................................................................................2

III. REPLOWING PREVIOUSLY PLOWED SOIL IS NOT A DISCHARGE.................5

IV. *MEYER V. HOLLEY* PRECLUDES MR. DUARTE'S PERSONAL LIABILITY.......6

V. THE "SIGNIFICANT NEXUS" TEST IS NOT THE STANDARD............................8

VI. MATERIAL DISPUTES OF FACT..........................................................................9

VII. CONCLUSION.....................................................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Borden Ranch P'ship v. U.S. Army Corps of Eng'rs*, 261 F.3d 810 (9th Cir. 2001) ................. 1, 2, 5, 6
*Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953 (7th Cir. 1999) ................................. 7
*Cardenas v. United States*, No. 13-35957 (9th Cir. June 21, 2016) ....................................... 8
*Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934 (7th Cir. 2004) ........................................... 5
*Illinois v. Commonwealth Edison Co.*, 490 F.Supp. 1145 (N.D. Ill. 1980) ........................................... 8
*L.A. Cty. Flood Control Dist. v. NRDC, Inc.*, 133 S.Ct. 710 (2013) ..................................... 5
*Leocal v. Ashcroft*, 543 U.S. 1 (2004) ................................................................................... 4
*Meyer v. Holley*, 537 U.S. 280 (2003) .................................................................................. 7
*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (en banc) ................................................. 6, 9
*People v. Celotex Corp.*, 516 F.Supp. 716 (C.D. Ill. 1981) .................................................. 8
*Rapanos v. United States*, 547 U.S. 715 (2006) ................................................................. 2, 8
*S. Fla. Water Management Dist. v. Miccosukee Tribe*, 541 U.S. 95 (2004) ......................... 5
*Sackett v. EPA*, 132 S. Ct. 1367 (2012) ................................................................................ 1
*Shurance v. Planning Control Int'l*, 839 F.2d 1347 (9th Cir. 1988) ..................................... 5
*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159 (2001) ............................ 9
*Steering Comm. v. United States*, 6 F.3d 572 (9th Cir. 1993) ............................................. 5
*Tri-Realty Co. v. Ursinus Coll.*, 124 F.Supp.3d 418 (E.D. Pa. 2015) .................................... 5
*Tull v. United States*, 481 U.S. 412 (1987) .......................................................................... 4
*United States v. Brace*, 41 F.3d 117 (3d Cir. 1994) ........................................................... 10
*United States v. Davis*, No. 13-30133 (9th Cir. June 13, 2016) (en banc) ............................ 8

**Statutes**

33 U.S.C. § 1311(a) ................................................................................................................ 6
33 U.S.C. § 1344(f) ........................................................................................................... 3, 10
33 U.S.C. § 1344(f)(2) ......................................................................................................... 10
33 U.S.C. § 1362(12) ............................................................................................................. 5

**Regulations**

33 C.F.R. § 323.2(f) ............................................................................................................... 3
33 C.F.R. § 323.4(a)(1)(ii) ......................................................................................... 4, 11, 12
33 C.F.R. § 323.4(a)(1)(iii)(D) ....................................................................................... 1, 2, 4, 5
33 C.F.R. § 328.3(a) ............................................................................................................ 10

**Other Authorities**

45 Fed.Reg. 33290 (May 19, 1980) ..................................................................................... 10
*Oxford English Dictionary* (1971) ........................................................................................ 1
Regulatory Guidance Letter 86-01 ........................................................................................ 3

I.  INTRODUCTION

The Government urges, and the Order so far adopts, the extreme and unprecedented position that plowing in any waters or wetlands is a discharge under the Clean Water Act even if no waters or wetlands are thereby destroyed. This, notwithstanding a regulation and decades of agency assurances that "plowing . . . will never involve a discharge of dredged or fill material" unless it "changes any area of the waters of the United States to dry land". (33 C.F.R. § 323.4(a)(1)(iii)(D).)

The Government and the Order reach the same result, but by somewhat different means. The Government acknowledges that the regulation excludes plowing as a discharge, but argues that the exclusion does not apply to Duarte's tillage because the resulting furrows and ridges amounted to "small mountain ranges" of "mini uplands", which the Government likens to "dry land", within waters and wetlands. How plowing might be accomplished without the quintessential furrows and ridges that result the Government does not venture to say.

The Order sidesteps the regulatory exclusion for plowing altogether. Without discussing it or considering whether there is any dispute about any area of waters or wetlands having been converted to dry land, the Order merely observes that Duarte's tillage caused "soil, to move horizontally, creating furrows and ridges", and that shuffling of soil, the Order said, is enough for a discharge.

But *all* plowing moves soil and creates furrows and ridges. (*Oxford English Dictionary* at 1006 (1971) (to "plow" is "[t]o make furrows in and turn up (the earth) with a plough").) If the furrows and ridges created by the mere 4-6 inches of plowing here are really regarded as "small mountain ranges" of "mini uplands", no plowing in what might be a wetland would ever be safe without a prohibitively expensive permit. This puts every farmer, backyard gardener, or kid with a shovel at potential risk of serious civil or criminal prosecution. (*See* Order at 10:3 (likening Duarte's plowing to "turning the garden").)[1]

This also stretches *Borden Ranch*—already questionable in light of two more recent Supreme Court cases narrowly interpreting "discharge"—past the breaking point. *Borden Ranch* held that, in

---

[1] "Any piece of land that is wet at least part of the year is in danger of being classified by [Government] employees as wetlands covered by the Act". (*Sackett v. EPA*, 132 S. Ct. 1367, 1375 (2012) (Alito, J., concurring).) The Order refers to *Sackett* as a "per curiam decision" (Order at 21:11). *Sackett* was a unanimous decision, authored by Justice Scalia.

1

the extreme "context" of ripping 5-7 feet deep, the complete obliteration of previously unplowed wetlands "can" be a discharge. (261 F.3d 810, 815 (9th Cir. 2001).) But *Borden Ranch* does not stand for the proposition at issue here: whether all movements of previously plowed soil within wetlands are discharges even if none are destroyed. Nor would that be tenable under the narrow interpretation of "discharge" more recently adopted by the two Supreme Court cases.

The legal landscape has also changed dramatically since the Order issued. The "significant nexus" test, advanced by Justice Kennedy's sole concurrence in *Rapanos* and relied upon by the Order, is now not the standard for determining which waters and wetlands are regulated by the Act. The Government's whole case falls apart without that significant nexus test.

The Government's other arguments are also wrong. The Court should reconsider its Order, or else certify it for interlocutory appeal and stay these proceedings.[2]

## II. DUARTE PLOWED

The Government asserts that the Order "considered and correctly rejected Duarte's argument that it merely 'plowed.'" (Opp. at 4:21-22.) No, it did not.

The Government, to its credit, does not walk back its previous concession that, if Duarte plowed, then it cannot have violated the Act. This is because the plowing regulation prescribes that "plowing will *never* involve a discharge of dredged or fill material." (33 C.F.R. § 323.4(a)(1)(iii)(D), emphasis added.) So if Duarte plowed, the Government cannot establish an element of its prima facie case—an actual "discharge"—and this suit is over, without any need to consider the more complicated but separate question, which the Order addresses at length (at 32:1-35:8), of whether any exemptions to the permit requirement for actual discharges apply.[3]

Instead, the Government makes three other arguments, tellingly *not* made in the Order, for why Duarte did not plow. First, the Government argues that Duarte caused "the redistribution of

---

[2] Although the Government quibbles about the wording of the standard, it does not dispute that this Court is not constrained from granting the requested relief. The Government also does not dispute that, if the Order is certified for interlocutory appeal, these proceedings should be stayed.

[3] Duarte argued at length that it could not have discharged because it plowed, and that the exclusion of "plowing" from the definition of "discharge" is distinct from the separate exemption from the permit requirement for discharges associated with "established" farming operations. (Dkt. #128 at 1:26-4:21, 8:17-9:19; Dkt. #150 at 1:24-4:11, 11:1-13:21; Dkt. #156 at 2:10-7:10.)

surface materials by blading, grading, or other means to fill in wetland areas". (Opp. at 4:22-24 (quoting plowing regulation).) But both the Government's experts and Duarte's experts agree that all the wetlands that were there before the plowing are still there. (Dkt. #133 at 4:4-5:3 (collecting both sides' evidence); Dkt. #150-6 at 4-7 (Duarte's expert explaining lack of foundation for "mini uplands"); Dkt. #156 at 5:1-7:10 (making legal argument).)[4] And "plowing" is not a "discharge of fill material". (33 C.F.R. § 323.2(f).) Duarte did not "fill in" any wetland areas.

Second, the Government argues that Duarte did not cause the "breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops". (Opp. at 5:1-4 (quoting plowing regulation).) But the Government conceded just the opposite when it marked this fact as "undisputed" in its briefing on summary judgment. (Dkt. #152-1 at 2:4.) And for good reason: its counterclaim alleges that Duarte ran "shanks through the ground" to "prepare[] much of the Site for planting" (Dkt. #28 ¶¶ 93-94), and its team of experts acknowledge Duarte's "tillage operations" for "crop production" (Dkt. #129-2 at 153). Duarte plainly prepared soil for crop planting.

Third, the Government argues that Duarte's property was not "farm … or ranch land". (Opp. at 5:2-6 (quoting plowing regulation).) But the Government's guidance on the plowing regulation does not read this reference as requiring that the property must be farm or ranch land at the time of the plowing to qualify. (Dkt. #163-1 ¶ 2 (Regulatory Guidance Letter 86-01) ("[s]ince 1975, Corps regulations have excluded 'plowing … for production of food, fiber, and forest products' from the definition of a discharge of dredged or fill material" (ellipses in original)).) The plowing regulation "is not subject to any of … the [33 U.S.C. § 1344(f)] exemption limitations", including the limitation the Government alludes to here that the property must not have been "converted to another use" (33 C.F.R. § 323.4(a)(1)(ii)). (Regulatory Guidance Letter 86-01 ¶ 3.) In any event, there is no serious dispute that the property is zoned for agriculture, has been farmed in the past, and has been grazed in more recent years. (Dkt. #133 at 3:6-25 (collecting evidence).) It is plainly farm or ranch land.

The Government defends the Order's conclusion that Duarte's plowing caused a discharge by

---

[4] The Government misrepresents the record when it asserts that the "uncontroverted evidence" is that "Duarte's operations *did* 'change any area … to dry land'" (Opp. at 5 n.3). The uncontroverted evidence, as the cited materials show, really is that Duarte's operations changed no area to dry land.

3

REPLY                                                                                      CASE NO. 13-CV-2095

arguing that "conveyances of soil … fall squarely within regulatory definitions of discharge of fill material … and discharge of dredged material." (Opp. at 4:10-16.)  No, they do not—at least when it is *plowing* that causes the soil conveyance.  Again:  the plowing regulation specifically *excludes* "plowing" (broadly defined) from the defined term "discharge of dredged or fill material."  (33 C.F.R. § 323.4(a)(1)(iii)(D).)  By the expedient of characterizing *all* soil conveyances caused by a plow within wetlands as a discharge, the Government and Order would reduce the regulation to the nonsensical proposition that plowing will "*never*" involve a discharge *except when it does*—and effectively drain the regulation of all meaning.  (*See id.*, emphasis added.)

The plowing regulation is not a nullity.  The Government meant what it said when it promulgated the regulation, explaining that "[p]lowing is not dredging or filling" and "plowing … is not a point source".  (*See* Dkt. #150 at 1:24-4:11.)  The EPA Administrator recently testified to Congress that this regulation was "intended to assure farmers that their plowing would not be regulated under the Clean Water Act." (Mem. at 4 n.1.)  Whether Duarte plowed is dispositive.[5]

The Court should reconsider whether Duarte plowed.  That analysis requires just two considerations:  (i) whether there was "primary tillage" (i.e., "physical means utilized on farm, forest or ranch land for the breaking up, cutting, turning over, or stirring of soil to prepare it for the planting of crops"), and (ii) whether Duarte "change[d] any area of the waters of the United States to dry land".  (33 C.F.R. § 323.4(a)(1)(iii)(D).)  There is no dispute, as discussed above, that the first consideration is met.  And the evidence is undisputed in Duarte's favor (or only weakly disputed by goofy, factually unsupported assertions about 4-6 inches of plowing creating "small mountain ranges" and "mini uplands") on the second.  Duarte is either not liable, or has created a material dispute of fact about liability.

If the Court does not reconsider its Order, the interpretation and applicability of the plowing regulation is an important, dispositive, legal issue that has yet to be addressed by the appellate

---

[5] Any remaining doubt about the plowing regulation's proper interpretation should be resolved in favor of Duarte, under the rule of lenity.  The Act's civil penalty provisions are "criminal in nature". (*Tull v. United States*, 481 U.S. 412, 418-421 (1987).)  The rule of lenity applies to actions, such as this one, seeking civil penalties of this kind.  (*See Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) (for statute with both civil and criminal penalties, "whether we encounter its application in a criminal or noncriminal context, the rule of lenity applies").)

4

1  courts, including *Borden Ranch*, and thus is ripe for interlocutory appeal.[6]

2  **III.    REPLOWING PREVIOUSLY PLOWED SOIL IS NOT A DISCHARGE**

*Miccosukee* and *L.A. County Flood Control* did not turn on whether water versus soil was redeposited into a water; they turned on narrowly interpreting the same statutory language at issue here: "discharge of a pollutant", i.e., the "*addition* of any pollutant". (*L.A. Cty. Flood Control Dist. v. NRDC, Inc.*, 133 S.Ct. 710, 713 (2013) (quoting 33 U.S.C. § 1362(12)).) The Supreme Court's poignant analogy explaining its reasoning turned not on water or soil, but *soup*: "if one takes a ladle of soup from a pot, lifts it above the pot, and pours it back into the pot, one has not 'added' soup or anything else to the pot". (*Id.*, brackets, some quotations, and citations omitted.) The Supreme Court cannot seriously have intended to mean that, if that ladle of soup contained a potato—perhaps, for good measure, with some unwashed dirt on it—then a dirty potato or anything else was *added* to the pot when the ladle was poured back in.

Other courts that have addressed these Supreme Court cases have recognized that they are not limited just to water transfers. (*See Tri-Realty Co. v. Ursinus Coll.*, 124 F.Supp.3d 418, 471 (E.D. Pa. 2015) (applying *Miccosukee* and *L.A. County Flood Control* to hold that *oil* transferred from one part of a wetland to another is not a discharge).)[7] No other courts have limited these Supreme Court cases just to water transfers.

The Government downplays the fact that Duarte's property had been plowed before. (Opp. at 8:7-11.) But the Government's whole theory of the case is that plowing soil transmogrifies that soil into a pollutant. The Government alleges that "[e]ach day" plowed soil remains in a wetland "constitutes a separate violation". (Counterclaim (dkt. #28) ¶ 23.) There is no evidence that the previously plowed soil on Duarte's property (a discharged pollutant each day it remains in place, in the Government's view) transmogrified back to a non-pollutant at any time before Duarte's plowing. If plowing soil transmogrifies soil into a pollutant, then replowing that "polluted" soil caused no

---

[6] *Shurance v. Planning Control Int'l*, 839 F.2d 1347, 1348 (9th Cir. 1988), is distinguishable because the interlocutory order there (a motion to disqualify), unlike here, did not resolve liability leaving only the remedy for trial. (*See Steering Comm. v. United States*, 6 F.3d 572, 575 n.1 (9th Cir. 1993) (interlocutory appeal of order resolving liability materially speeds termination of litigation).)

[7] *Greenfield Mills, Inc. v. Macklin*, 361 F.3d 934 (7th Cir. 2004), did not cite or apply *Miccosukee* or *L.A. County Flood Control*.

5

REPLY                                              CASE NO. 13-CV-2095

1  *addition* of a pollutant, just as ladling potato soup back into its pot adds nothing (much less a
2  pollutant) to that pot.  When Duarte replowed previously plowed soil, it added no pollutant, and thus
3  caused no discharge.

4        The Government does not dispute that no appellate courts have considered the effect of these
5  two recent Supreme Court cases on *Borden Ranch*.  District courts are not constrained from
6  reconsidering earlier Ninth Circuit panel opinions, even if those opinions have not been "expressly
7  overruled", if there has been "clearly irreconcilable" intervening Supreme Court or en banc
8  authority.  (*Miller v. Gammie*, 335 F.3d 889, 899-900 (9th Cir. 2003) (en banc).)  If *Borden Ranch* is
9  read, as the Government and Order do, to hold that all redeposits of soil in wetlands are discharges,
10 then these two recent Supreme Court cases clearly limit, or effectively overrule, that holding.
11 Reconsideration of the continuing validity of *Borden Ranch*, or certification of an interlocutory
12 appeal and stay, should be granted.

13     **IV.**     ***MEYER V. HOLLEY* PRECLUDES MR. DUARTE'S PERSONAL LIABILITY**

14       The Government's brief perpetuates confusion about some black-letter basics of liability.
15 The Act generally prohibits "the discharge of any pollutant by any person".  (33 U.S.C. § 1311(a).)
16 The question here is, if there was a discharge, which person is responsible?  This case presents three
17 possible suspects—an agent (Mr. Unruh), a principal (Duarte Nursery), and an officer of the
18 principal (Mr. Duarte):

19 - The *agent* is Mr. Unruh, who did the plowing at issue for Duarte Nursery. (Order at 9:23-
20   10:11.) If there was a discharge, there is no dispute that Mr. Unruh is a discharger. The
21   Government has gone out of its way to try to intimidate Mr. Unruh and his family (Dkt. #114
22   at 209:15-213:2), but has so far wisely elected not to prosecute him.

23 - The *principal* is Duarte Nursery, which owns the property, had Mr. Unruh plow it on its
24   behalf, and paid for the plowing. Under the "ordinary principles of vicarious liability"
25   trumpeted by the Government (Opp. at 10:5-7), if Mr. Unruh's plowing was a discharge,
26   there is no dispute that Duarte Nursery, as Mr. Unruh's principal, would be vicariously liable.
27   The Government is pressing its full counterclaim against Duarte Nursery.

28 - That leaves the *officer*, Mr. Duarte. Mr. Duarte is Duarte Nursery's President. Mr. Duarte

1   personally authorized the plowing on behalf of Duarte Nursery, but took no part in the actual
2   on-the-ground operations.  The legal issue presented is whether, if plowing is a discharge, the
3   mere act of authorizing a company to plow, as its President, is enough for personal liability.

4   The Order applied the responsible-corporate-officer doctrine to hold that, yes, this is enough
5   for Mr. Duarte's personal liability.  There is no dispute that, if the responsible-corporate-officer
6   doctrine applies, Mr. Duarte would be liable.  But there is also no grounds for holding Mr. Duarte
7   personally liable for the acts of his company *unless* the responsible-corporate-officer doctrine
8   applies.  (*See Browning-Ferris Indus. of Ill., Inc. v. Ter Maat*, 195 F.3d 953, 956 (7th Cir. 1999)
9   ("there is no doctrine of 'superiors' liability,' comparable to the doctrine of respondeat superior").)

10  The Supreme Court, in *Meyer v. Holley*, 537 U.S. 280 (2003), recently addressed the
11  responsible-corporate-officer doctrine, and placed strict limits on it.[8]  Although the Order does not
12  address *Meyer*, the Government concedes that it stands for the proposition that the doctrine applies
13  only when "Congress intended such a result" (Opp. at 9:11-12).  Indeed, *Meyer* held that the doctrine
14  applies "only where Congress has specified that such was its intent."  (*Meyer*. at 287.)
15  Congressional "silence" on holding corporate officers personally responsible for the acts of their
16  corporations is insufficient, as a matter of law, for those officers' personal liability.  (*Id.* at 286, 290.)

17  The Order acknowledges, and the Government does not dispute, that the Act is silent on
18  holding corporate officers personally responsible for alleged civil violations.  Neither the Order, nor
19  the Government, point to *any* evidence that Congress actually intended the doctrine to apply to
20  alleged civil violations of the Act.

21  The Government asserts that "six" cases "concluded that Congress intended the responsible
22  corporate officer doctrine to apply" to the Act (Opp. at 10:3-4).  But *none* of those cases, or any
23  others, actually discuss Congressional intent, much less found that Congress actually intended the
24  doctrine to apply to the Act.  The only cases to actually consider Congressional intent, under
25  analogous provisions of the Clean Air Act, found that Congress did not intend the doctrine to apply.

26

---

27  [8] The Government again misrepresents the record when it asserts that Duarte gave "short shrift" to
    this case.  Duarte made the case a central issue, and addressed it over nine pages, in three briefs.
28  (Dkt. #120 at 4-7; Dkt. #150 at 18-20; Dkt. #157 at 4-5.)

7

1  (*Illinois v. Commonwealth Edison Co.*, 490 F.Supp. 1145, 1148 (N.D. Ill. 1980); *People v. Celotex*
2  *Corp.*, 516 F.Supp. 716, 719 (C.D. Ill. 1981).)  That silence, and lack of any evidence of
3  Congressional intent otherwise, precludes Mr. Duarte's personal liability as a matter of law.
4      The Court should reconsider this dispositive legal issue, which is controlled by Supreme
5  Court precedent that conflicts with the Order, or else certify it for interlocutory appeal.

## V.  THE "SIGNIFICANT NEXUS" TEST IS NOT THE STANDARD

The legal landscape has changed significantly in the two weeks following the Order:  the "significant nexus" test for determining which are "navigable waters" under the Act, articulated by Justice Kennedy's sole concurrence in *Rapanos v. United States*, 547 U.S. 715, 782 (2006) and relied upon by the Order, is now *not* the standard.  On June 13, an en banc panel of the Ninth Circuit reconsidered how the Ninth Circuit is to interpret fractured U.S. Supreme Court opinions such as *Rapanos*, holding that "where we can identify no rationale common to a majority of the Justices, we are bound only by the result." (*United States v. Davis*, No. 13-30133, slip op. at 5 (June 13, 2016).) A week later, another Ninth Circuit panel applied *Davis*, further clarifying that, in ascertaining whether a majority of the Justices in a fractured decision share a common rationale, only the views of the "Justices who support the judgment" may be considered, i.e., dissenters should not be counted, contrary to what the Government now argues (Opp. at 12:21-13:6).  (*Cardenas v. United States*, No. 13-35957, slip op. at 12-13 (June 21, 2016) (internal citation and quotation marks omitted).)  A sole concurrence may be binding only where it "posits a narrow test to which the plurality must necessarily agree as a logical consequence of its own, broader position". (*Id.*)

All eight of the other Justices in *Rapanos* specifically disagreed with Justice Kennedy's sole concurrence. (Dkt. #128 at 16:23-17:17.)  Justice Kennedy also specifically disagreed with the reasoning of both the plurality and the dissent.  (547 U.S. at 767-780.)  Justice Kennedy's concurrence articulated a broader test than the narrow one articulated by the plurality. (*See id*. at 778 ("the plurality reads non-existent requirements into the Act").)  Because Justice Kennedy's sole concurrence does not "embody a position implicitly approved by at least five Justices who support the judgment", and does not "posit[] a narrow test to which the plurality must necessarily agree as a logical consequence of its own, broader position" (*see Cardenas* slip op. at 13), that sole

8

1  concurrence cannot be controlling here.  This Court is no longer bound by prior Ninth Circuit

2  authority, which has now been implicitly overruled, holding otherwise.  (*See Miller v. Gammie*, 335

3  F.3d at 899-900.)

4      Prior to *Rapanos*, the Supreme Court agreed on a narrow standard for "navigable waters"

5  under the Act.  The Court held that "the text of the statute" did not cover "ponds that are not adjacent

6  to open water."  (*Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 168 (2001).)

7  Rather, "navigable waters" are "waters that were or had been navigable in fact or which could

8  reasonably be so made", such as wetlands adjacent to navigable-in-fact waters.  (*Id.* at 172.)

9      The Government does not assert that Duarte plowed in any navigable-in-fact waters (such as

10  the Sacramento River), or wetlands immediately adjacent to such waters.  Rather, the Government

11  contends that the Act also extends to "tributaries" and their "adjacent wetlands".  (Opp. at 13:14-17

12  (quoting 33 C.F.R. § 328.3(a)).)  The only tributary on the property identified in the Order is Coyote

13  Creek.  (Order at 4:15-16.)  Duarte's evidence (which neither the Order nor the Government

14  acknowledges) is that Duarte's plowing steered well clear of Coyote Creek.  (Dkt. #132-1 at 11

15  ("Agricultural activities conducted on the site during November and December 2012 did not involve

16  work within … Coyote Creek … . There are shallow furrows apparent in the grasslands adjacent to

17  the channels, but no evidence of tillage within the creeks.").)  Duarte is not liable.

18      The Court should reconsider its Order to address the proper standard for determining

19  "navigable waters" under the Act.  Alternatively, in light of the new Ninth Circuit cases, certification

20  of this important and dispositive legal issue for interlocutory appeal is now also appropriate.

21          **VI.   MATERIAL DISPUTES OF FACT**

22      The Order is remarkable in that it finds no disputes of material fact, without even once

23  acknowledging any of the *ten* expert reports Duarte submitted.  And the Government, in defending

24  the Order, continues to misrepresent the record by asserting that the evidence it submitted is

25  "uncontroverted".  (Opp. at 14:6.)[9]  But Duarte hotly disputes the Government's evidence of several

---

[9] Duarte's evidence about the farming history, for example, is based on aerial photos and interviews with people who performed or witnessed the prior plowing, and who reported that prior plowings were more intensive than Duarte's, contrary to the report of Mr. Stokely (who has never even visited the property).  (*See* Dkt. #150-5 at 12 ("prior tillage … was probably more disruptive and moved

9

REPLY                                                                                 CASE NO. 13-CV-2095

material points. Those disputes preclude summary judgment for the Government.

The Government discounts Duarte's evidence that the prior cattle grazing on the property was analogous to Duarte's plowing by citing to an EPA website stating that cattle grazing is "non-point source pollution". (Opp. at 14:3-5.) But the Government neglects to mention that EPA has formally recognized, in justifying the plowing regulation, that "plowing … is not a point source" as well. (45 Fed.Reg. 33290, 33398 (May 19, 1980).) This material dispute should be reconsidered.

The Government also questions the relevance of Duarte's evidence that the "irregular but persistent" cycle of plowing on its property is consistent with the conventions of other farmers in the region. (Opp. at 14:10-20.) This evidence is relevant because a farming operation is "established", for purposes of the normal-farming-practices exemption, 33 U.S.C. § 1344(f), if the activity is part of a "conventional rotational cycle". (33 C.F.R. § 323.4(a)(1)(ii).) Because Duarte's plowing is part of a conventional rotational cycle, it is "established". *United States v. Brace* is distinguishable because the property at issue there, unlike here, had never been farmed before, and the defendant's activities "brought an area into farming use". (41 F.3d 117, 126 (3d Cir. 1994) (paraphrasing 33 C.F.R. § 323.4(a)(1)(ii)).)[10] This material dispute should also be reconsidered.

### VII. CONCLUSION

The Court should reconsider its order, or certify it for interlocutory appeal and stay these proceedings.

DATED: June 28, 2016

BRISCOE IVESTER & BAZEL LLP

By: */s/ Peter S. Prows*
    Peter S. Prows
    Attorneys for DUARTE NURSERY, INC. and
    JOHN DUARTE

---

more dirt than did the chiseling done in 2012"); Dkt. #150-8 at 10 ("in the early 1980's … the southern portion of the property (at least) was floated (minor leveling undertaken with a modified land plane or box) … [and] [a]n attempt was made in the 1970s to deep-rip the property using some large equipment and ripping shanks").)

[10] The Government asserts (at 15:5-6) that the Order "found" that the "recapture" provision, 33 U.S.C. § 1344(f)(2), nevertheless applies. The Order made no such finding.